COMMONWEALTH vs. BRADFORD W. PRENDERGAST.

Norfolk.   December 9, 1981. — March 25, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Practice, Criminal*, Examination of jurors, Conduct of prosecutor, Argument by prosecutor, Instructions to jury, Capital case. *Insanity. Homicide.*

At a criminal trial, evidence did not show a substantial risk of juror bias against the defense of lack of criminal responsibility and, in the circumstances, the judge properly explored each potential juror's view on the subject of criminal responsibility. [627-629]

During the empanelment of the jury at a defendant's trial for murder prior to the decision of this court in *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648 (1980), the exclusion of five potential jurors opposed to capital punishment did not, in the circumstances, deprive the defendant of a jury that could fairly and objectively determine his guilt or innocence. [629]

The defendant in a criminal case was not entitled to a mistrial by reason of the prosecutor's objecting, in the presence of the jury, to the competency of a psychologist's professional opinion, where the judge immediately instructed the jury to disregard the prosecutor's remarks. [630-631]

At a criminal trial, the judge's prompt action in sustaining objections to two questions by the prosecutor on redirect examination of a Commonwealth witness was sufficient to neutralize any possible prejudice. [631-632]

At a criminal trial, a prosecutor's questions to the Commonwealth's expert witness, which were aimed at rehabilitating his credibility after cross-examination, were not unfairly prejudicial. [632-633]

At a criminal trial, a remark by the prosecutor in closing argument, respecting the issue of the defendant's criminal responsibility, was within the prosecutor's right of retaliatory reply and did not create a false impression that the doctors who had prepared the defendant's medical records had concluded he was criminally responsible. [633-634]

At a murder trial, the judge's instructions adequately informed the jury of the effect of the defendant's mental condition on the issues of deliberate premeditation and extreme atrocity or cruelty. [634-635]

A defendant convicted of murder in the first degree was not entitled to a new trial or the entry of a verdict of a lesser degree of guilt under G. L. c. 278, § 33E, where there was ample evidence to support the jury's conclusion that the defendant's conduct exhibited an ability to control his behavior and an awareness of the wrongfulness of his conduct. [635-638]

INDICTMENTS found and returned in the Superior Court Department on December 27, 1979.

The cases were tried before *Donahue, J.*

*Joseph J. Balliro (Julie Ann Balliro* with him) for the defendant.

*Charles J. Hely,* Assistant District Attorney (*Carmen Picknally,* Assistant District Attorney, with him) for the Commonwealth.

ABRAMS, J. The defendant, Bradford W. Prendergast, was convicted of murder in the first degree for the December 20, 1979, slaying of Patricia Gilmore. At trial, the defendant acknowledged that he killed the victim, but he asserted that he was not criminally responsible. The jurors rejected the defendant's claim that he was not criminally responsible and returned a verdict of guilty of murder in the first degree.[1] On appeal, the defendant argues error concerning (1) the empanelment of the jury; (2) the denial of a motion for a mistrial based on the prosecutor's conduct; (3) the denial of a motion for a mistrial based on the prosecutor's summation; and (4) the judge's instructions. Finally, the defend-

---

[1] The defendant was also charged with, and convicted of, four counts of armed assault in a dwelling house, one indictment charging kidnapping, and one indictment charging possession of a dangerous weapon. The defendant was sentenced to the Massachusetts Correctional Institution at Walpole for life imprisonment on the conviction of murder in the first degree. A nine to ten year sentence concurrent with the life sentence for murder was imposed on the kidnapping charge. Life sentences were imposed on the four convictions for armed assault in a dwelling house. These sentences were to be served concurrently with each other and from and after the sentence for murder in the first degree. The indictment charging unlawful possession of a dangerous weapon was placed on file with the defendant's consent, and is therefore not before this court on appeal. See *Commonwealth* v. *Tavares, ante* 140, 141 n.1 (1982).

ant argues that "justice and fairness demand that [he] be granted a new trial." G. L. c. 278, § 33E. We affirm the defendant's convictions. We conclude that there is no reason to exercise our power under G. L. c. 278, § 33E.

1. A. *Jury empanelment.* The defendant asserts that prejudice against the defense of lack of criminal responsibility is as pervasive as racial prejudice and thus "there [is] a substantial risk that the jury [were] influenced by extraneous issues." *Commonwealth* v. *Sanders*, 383 Mass. 637, 639-640 (1981). In light of this risk, the defendant claims error in the refusal of the trial judge to pose the following question to potential jurors: "If the evidence presented warrants a finding that the defendant is guilty of murder and the evidence further warrants a finding that the defendant had a mental disease at the time of the alleged crime, and as a result of this mental disease, he did not have substantial capacity to conform his conduct to the requirements of law, have you any opinions that would prevent you from finding the defendant not guilty by reason of insanity?"

To support his argument, the defendant relies on thirteen newspaper articles. Only four of these articles appeared prior to the empanelment. Although all four articles mentioned Prendergast, only one discussed the issue of criminal responsibility. The defendant's evidence does not show a substantial risk of juror bias against the defense of lack of criminal responsibility.

"[W]e are not prepared to assume . . . that there is such widespread prejudice against psychiatrists and the concept of criminal irresponsibility as to mandate pretrial inquiry on these subjects. See *Commonwealth* v. *Ricard*, 355 Mass. 509, 511-512 (1969). Absent some reason to suspect that the jurors may be so prejudiced, see *Commonwealth* v. *Campbell*, 378 Mass. 680, 696 (1979), a judge is warranted in relying upon his final charge to the jury to purge any bias from the jurors prior to their deliberations." *Commonwealth* v. *Estremera*, 383 Mass. 382, 388 (1981).

Further, the judge inquired of each potential juror as to his or her knowledge of the case, if any, from the media. He

also asked each potential juror whether he or she had the ability to consider psychiatric testimony impartially. In response to these questions some potential jurors admitted that they would be biased against finding the defendant not guilty by reason of insanity. The judge excused those jurors.[2] Moreover, if the judge received an answer which he or either party regarded as equivocal, the judge would ask additional questions.[3] Finally, throughout the empanelment, the judge excused several jurors whose answers were "marginal" so that the defendant could conserve his peremptory challenges. Thus, we conclude that the judge did explore each potential juror's view on the subject of criminal responsibility, although he did not ask the precise question suggested by the defendant. "The judge has broad discretion as to the questions to be asked, and need not put the specific questions proposed by the defendant." *Commonwealth* v. *Sanders*, 383 Mass. 637, 641 (1981).

We do not require as a matter of law that questions be directed at discovering bias against the defense of lack of criminal responsibility "in every case involving testimony by psychiatrists and the defense of insanity." *Commonwealth* v. *Estremera*, 383 Mass. 382, 388 (1981), quoting from *Commonwealth* v. *Killelea*, 370 Mass. 638, 649-650 (1976). Nevertheless if the defendant shows that there is a "substan-

---

[2] At one point, the judge asked the defendant's attorney whether if he (the judge) received a response that indicated juror bias concerning criminal responsibility, should he (the judge) ask further questions. The defendant's lawyer said there was no need.

[3] For example, the judge posed the following questions: "The issue may go beyond guilt or innocence. The real issue might be whether or not he was insane at the time. Could you sit on the jury on an issue like that?"

"Do you have some basic philosophy as to responsibility for a person's actions?"

"If [criminal responsibility is] put in issue do you think you could decide?"

"[W]ould you find it hard to accept that a person might say, 'Yes, I committed a certain crime and I didn't know what I was doing because I was legally insane at the time'?"

"If I gave you a legal definition of insanity as it applies to this case, do you think you could follow it?"

tial risk that the jury would be influenced by extraneous issues," *Commonwealth* v. *Sanders*, 383 Mass. 637, 639-640 (1981), the judge should ask questions aimed at discovering those factors.

B. *Capital punishment.* The defendant claims that the judge wrongfully excluded five jurors opposed to capital punishment. The defendant asserts that the exclusion of these five jurors produced a jury that favored the prosecution.[4] We disagree.

At the time of the defendant's trial, St. 1979, c. 488, had not been declared unconstitutional. See *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648 (1980). There was therefore a possibility that the defendant might be sentenced to death. In these circumstances, there was no error in the judge's asking prospective jurors if they had a "belief, philosophy, state of mind or opinion, which would prevent [them] from making a recommendation, either to impose the death penalty or not to impose the death penalty." See *Commonwealth* v. *Curry*, 368 Mass. 195, 203-204 (1975); *Commonwealth* v. *Ladetto*, 349 Mass. 237, 245 (1965). The five potential jurors who were excluded all indicated that they would not recommend the death penalty in any circumstance. In addition, the judge declared indifferent one juror who was generally opposed to capital punishment. We, therefore, are not persuaded that the exclusion of the five jurors in this case deprived the defendant of a jury that could fairly and objectively determine his guilt or innocence.[5]

---

[4] We have rejected the argument that excluding jurors opposed to the death penalty always produces prosecution prone juries. See *Commonwealth* v. *McAlister*, 365 Mass. 454, 458 (1974), and cases cited, cert. denied, 419 U.S. 1115 (1975). Thus, we have held that the exclusion of jurors generally opposed to capital punishment invalidates the sentence, not the conviction. *Commonwealth* v. *Valliere*, 366 Mass. 479, 487-488 (1974). *Commonwealth* v. *Stone*, 366 Mass. 506, 508-509 (1974).

[5] The defendant also claims that the judge should not have asked prospective jurors about capital punishment because the defendant did not receive adequate notice of an aggravating circumstance. See St. 1979, c. 488, § 3 (G. L. c. 279, § 53). The Commonwealth had supplied the

2. *Motion for a mistrial based on prosecutorial conduct.* The defendant claims that the judge erred in denying the defendant's motion for a mistrial based on what he perceives as prosecutorial errors: (1) the prosecutor's objections to the admission of a psychologist's opinion in a medical record; (2) the prosecutor's question concerning the opinion of a psychiatrist in a medical record; and (3) the prosecutor's redirect examination of the Commonwealth's psychiatrist. We conclude that there is no error.

A. *Objection to psychologist's opinion in a medical record.* The defendant claims that during the trial the prosecutor unfairly sought to diminish the importance of an opinion of a psychologist in a medical record. The psychologist was the deputy medical director of the Massachusetts Correctional Institution at Bridgewater. In a report, dated August 16, 1979, the psychologist wrote that the defendant is "mentally ill" and that failure to hospitalize [this patient] in strict security would constitute a likelihood of serious harm . . . to at least one potential victim and to himself." In the presence of the jury, the prosecutor objected to a "psychologist making a medical opinion. It is not competent, practicing medicine without a license." The defendant objected and the judge sustained the objection. The judge immediately instructed the jury to disregard the prosecutor's remarks.[6] The judge acted promptly to neutralize the preju-

---

defendant with most of its evidence prior to trial. That evidence gave the defendant adequate notice of aggravating circumstances. Moreover, St. 1979, c. 488, § 3, provided that, if there were an error in the presentence hearing, a new trial should be held only on the issue of punishment. Thus, the defendant would have no right to a new trial on the issue of guilt, even if he were correct in his assertion.

[6] The judge immediately instructed the jury as follows:

THE JUDGE: "Mr. Foreman and members of the jury: Ordinarily when an attorney objects to a question the objection, or asks that an answer be struck from the record, the Court may be required to listen to the reason for it, which might be hearsay, or it might be irrelevant or incompetent; but the Court is not required to hear argument.

"It's been apparent during this case that occasionally counsel, both counsel, have argued their objections before the jury. Perhaps each time it happens I should hold a side bar conference; but if I did that we'd be

dicial effect, if any, arising out of the prosecutor's statement. "[W]e shall not assume that jurors will slight strong and precise instructions of the trial judge to disregard the matters which have been withdrawn from their consideration." *Commonwealth* v. *Gordon,* 356 Mass. 598, 604 (1970).

B. *Question concerning psychiatrist's opinion in a medical record.* The defendant claims that a portion of the redirect examination of the prosecution's expert on criminal responsibility was unfairly prejudicial. Specifically, the defendant objects to the following questions by the prosecutor: "[D]id you receive any information that causes you to change your opinion as to criminal responsibility . . .?" "Did you, in fact, determine [whether a doctor had an] opinion as to the criminal responsibility of Bradford Prendergast." The defendant claims that these questions incorrectly suggested that two doctors had concluded that Prendergast was criminally responsible.[7]

At trial, the judge sustained the defendant's objections to these questions. The Commonwealth's expert was not allowed to answer these questions. Further, the prosecutor did not even finish the question about the doctor. This in-

---

spending more than half the day at the side bar and the jury would hear very little evidence.

"I have informed counsel that in the future in this case, when they object to something, either a question or an answer given, they may state their reason succinctly; that is, whether it's hearsay, on the question of relevancy, and so forth, but they may not argue in front of the jury unless I request it."

". . . ."

DEFENSE COUNSEL: "Respectfully, Your Honor, would you instruct the jury to disregard [the prosecutor's] comments?"

THE JUDGE: "Yes. Any remark by an attorney in this case as to qualifications of a witness, how to assess a witness' testimony, is not for the attorney, it is for the jury, the jury in the final analysis must assess the testimony of all witnesses."

[7] The doctor was not a witness at trial, but was a psychiatrist at the McLean Hospital. The McLean Hospital discharge diagnosis was that the defendant's condition had "mildly improved." The doctor named in the question signed the report.

complete question gave the jury no idea of the doctor's opinion.[8] We conclude that the judge's action in promptly sustaining the defendant's objection was sufficient to neutralize any possible prejudice. There was no error in denying the defendant's motion for a mistrial.

C. *Redirect examination of the Commonwealth's expert.* The defendant's final point challenges the prosecutor's redirect examination of the Commonwealth's expert. The Commonwealth's expert rejected the opinion of the chief psychiatrist at Lemuel Shattuck Hospital (the defendant's expert) that the defendant was unable to conform his conduct to the requirements of the law on December 20, 1979. On cross-examination, defense counsel asked the Commonwealth's expert if he had taken the defense expert's opinion into consideration when he concluded that Prendergast was criminally responsible. On redirect examination, the prosecutor asked the Commonwealth's expert several questions aimed at explaining his rejection of the defense expert's opinion. These questions included the following: "Were you aware that [the defense expert] . . . changed his opinion for the third time, regarding his observations of [Bradford] Prendergast?" "Were you aware that . . . [the defense expert] got up at 8:00 o'clock in the morning and went over to [the defendant's attorney's] office, to discuss what his testimony was to be?" The defendant claims that these questions were unfairly prejudicial because they suggested that defense counsel tried to fabricate the defense expert's testimony.[9]

As we read the record, these questions were aimed at rehabilitating the credibility of the Commonwealth's expert. The prosecutor asked these questions on redirect examination after the defendant had tried to discredit the opinion of

[8] The doctor's opinion was before the jury as part of the McLean Hospital report. See note 7, *supra*.

[9] The prosecutor's questions were supported by the evidence. On cross-examination, the defense expert admitted that he had changed his mind three times. He also acknowledged that he formed his opinion on criminal responsibility after he met with the defendant's attorney.

the Commonwealth's expert. In asking these questions, the prosecutor was eliciting an explanation as to why the Commonwealth's expert rejected the opinion of the psychiatrist who interviewed the defendant on December 21, 1979, the day after the slaying. "The party for whom a witness testified may introduce evidence that contradicts or explains the evidence adduced to impeach the witness." P.J. Liacos, Massachusetts Evidence 165-166 (5th ed. 1981), and cases cited. There was no error.

3. *Prosecutor's summation.* The defendant claims that the judge erred in denying his motion for a mistrial based upon a remark made by the prosecutor during closing argument. In his closing, the prosecutor remarked that the defendant's hospital records do not mention that Prendergast lacked criminal responsibility. The defendant asserts this remark is unduly prejudicial because it suggests that the doctors who prepared these records concluded that Prendergast was criminally responsible. Since these records were prepared before criminal responsibility became an issue, the defendant argues that his remark impermissibly exceeded the bounds of fair argument by creating a false impression that the defendant had been found criminally responsible. We do not agree.

The summation of the prosecutor suggested to the jury that the diagnosis in the hospital records that the defendant was mentally ill did not foreclose juror consideration on the issue of criminal responsibility. The prosecutor stated that the two issues were different and that the issue before the jury was criminal responsibility, not mental illness. He conceded that the defendant was mentally ill.

Further, the prosecutor made this comment in response to the defense attorney's closing remarks. In his summation, the lawyer for the defense cited the defendant's hospital records as evidence that the defendant was mentally ill and dangerous and, therefore, not criminally responsible. In this context, the prosecutor's statement about the hospital records was within the prosecutor's right of retaliatory reply. See *Commonwealth* v. *McColl*, 375 Mass. 316, 325

(1978). Cf. *Commonwealth* v. *Burke*, 373 Mass. 569, 576 (1977); *Commonwealth* v. *Haas*, 373 Mass. 545, 561 (1977). Finally, "[t]he jury could be expected to take both arguments with a grain of salt." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 277 (1982).

4. *Instructions on mental impairment.* The defendant claims that the judge did not properly instruct the jury to consider the effect of the defendant's mental condition on the issues of deliberate premeditation and extreme atrocity or cruelty.[10] We disagree.

Since the defendant did not object at trial to the instruction on the effect of mental impairment, we review this claim under G. L. c. 278, § 33E, to determine whether there is a "substantial likelihood that a miscarriage of justice has occurred." *Commonwealth* v. *Garcia*, 379 Mass. 422, 439 (1980). We only reverse on a showing of grave prejudice. *Commonwealth* v. *Tavares*, 385 Mass. 140, 149 (1982).

If expert testimony on the defendant's mental state is presented, a "judge should instruct the jury that the defendant's mental illness may be considered on the issue of deliberate premeditation . . . [and] extreme atrocity or cruelty." *Commonwealth* v. *Gould*, 380 Mass. 672, 683, 686 (1980). "Evidence of the defendant's mental disease . . . bears on the specific intent required for murder in the first degree . . . ." *Id.* at 682.

In this case, the judge told the jury that they "may consider a defendant's long-standing mental illness in ascertaining whether the defendant had sufficient mental capacity to deliberately premeditate the acts charged." Quoting from *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), the judge defined deliberate premeditation as "'critically evaluating the pros and cons of proceeding to effectuate the desire.'" *Id.* at 683. The judge explained that if the defendant suf-

---

[10] There were no instructions on felony-murder. The Commonwealth did not claim the armed assault in the dwelling house, G. L. c. 265, § 18A, and the murder were part of a single occurrence so as to invoke the felony-murder doctrine, G. L. c. 265, § 1.

fered from a mental impairment "that affected his mental processes," the jury should reduce the verdict from murder in the first degree to murder in the second degree. These instructions adequately informed the jury of the effect of the defendant's mental condition on his ability to premeditate.

In his charge, the judge instructed the jury that an impaired mind may be considered as evidence whether or not the defendant committed murder with extreme atrocity or cruelty. The judge told the jury that in determining extreme atrocity or cruelty, they "are not restricted to considering only the defendant's course of action, but are also permitted to consider the defendant's peculiar mental state." We believe that the judge adequately informed the jury that they should consider the defendant's mental state on the issue of extreme atrocity or cruelty.[11] We conclude that the defendant has failed to show a substantial likelihood of a miscarriage of justice.

5. *Relief pursuant to G. L. c. 278, § 33E.* The court has the obligation pursuant to § 33E to consider the whole case on the law and the facts. "Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence . . . or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt." G. L. c. 278, § 33E, as amended through St. 1979, c. 346, § 2. Our power is to be used with restraint. *Commonwealth* v. *MacDonald*, 371 Mass. 600, 604 (1976).

On December 20, 1979, the defendant on furlough from the Billerica house of correction[12] purchased a knife with a

---

[11] In any event a failure properly to instruct the jury that they should take into consideration the defendant's mental state in reaching their verdict may result in reducing the degree of murder from murder in the first degree to murder in the second degree but does not necessarily result in a new trial. See *Commonwealth* v. *Perry, post* 639, 649-650 (1982). Compare *Commonwealth* v. *Gould*, 380 Mass. 672, 686 (1980).

[12] On September 28, 1979, the defendant was found guilty on a complaint by the victim of threats to murder. He was sentenced to a term of six months in the Billerica house of correction. When he was furloughed on December 19, 1979, the defendant took all his belongings with him.

six-inch blade from one store and a starter pistol from another. He paid for the items with a credit card. The sales personnel who observed the defendant did not notice anything bizarre or unusual in the defendant's behavior.[13]

The victim, the defendant's former girl friend,[14] came home for lunch at approximately 1:35 p.m. At that time the victim's two sisters, her brother, and her mother were at home. Shortly after the victim arrived home, the defendant ran through the front door holding a gun.[15] He said "Don't anyone move or I'll shoot you. . . . I've been planning this for a year."[16] He asked for money so he could leave the State. He grabbed the victim and left.[17]

At approximately 4:23 p.m., the defendant registered at the Dedham Holiday Inn. He appeared calm, mild and

[13] One clerk stated that the defendant "acted like he was in a hurry, like people who come in at lunchtime, want you to wait on them and leave."

[14] The victim and the defendant became engaged in June, 1977. The victim broke her engagement with the defendant in September, 1978. From September, 1978, to September 28, 1979, when he was sentenced to the Billerica house of correction, see note 12, supra, the defendant threatened the victim on a number of occasions.

[15] When the victim's younger sister came into the room, the defendant said to the victim's mother, "Shut her up or I'll blow her head off." The defendant was described as being "calm" and "angry," while in the victim's home. He also told the victim's family that he had escaped from prison. See note 12, supra.

[16] On June 30, 1979, the defendant called the victim at home. To get her to answer his call, he stated that he was a detective. When she answered the phone, he said, "I almost killed you today. I came very close to doing it, but I was stopped." (This telephone call was the basis of a complaint of threats to murder which resulted in the defendant's sentence to the Billerica house of correction.) The evidence also revealed that, while at Bridgewater State Hospital for observation prior to the sentencing on the complaint, the defendant asked an inmate to kill the victim; the defendant also stated that he wanted a gun and would pay the inmate $500 for a gun. After the inmate's release, he received several collect telephone calls from the defendant. (The inmate refused to accept these collect telephone calls.)

[17] As the defendant and the victim were leaving, the defendant told the victim's mother, "Don't you dare follow me or get in my way. . . . Don't [you] dare call the police . . . or I'll kill her right here." As soon as the defendant left the house, the police were notified.

"quite composed." At 5:45 P.M., the defendant was found in the corridor of the Holiday Inn with cuts on his wrists and neck. The bathtub was filled with bloody water, and the curtain reel was pulled out to one side. It had a rope noose tied to it. The defendant told police that he loved the victim, that he stabbed the victim, and that Satan made him stab her.

The victim was found in Middleborough at approximately 8 P.M. Her hands were tied behind her back. She had been stabbed twenty-six times. Cuts in the victim's right hand were described as defensive wounds.

There was evidence that three psychiatrists were of the opinion that the defendant was not criminally responsible for his conduct. See *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). Additionally, there was evidence that from October, 1978, to September 28, 1979, the defendant was in and out of various institutions for the mentally ill and had several diagnoses including severe depression and schizophrenia.[18] His treatment included electro-convulsive shock.

---

[18] In October, 1978, the defendant was admitted to Glenside Hospital with a condition diagnosed as neurotic depression. On February 12, 1979, he voluntarily committed himself to Medfield State Hospital. From Medfield, he was referred to the outpatient clinic. On February 19, 1979, the defendant was suffering from marked depression with suicidal and homicidal tendencies and was readmitted to Glenside Hospital. From February 22, 1979, to April 24, 1979, the defendant voluntarily committed himself to McLean Hospital where he was diagnosed as a paranoid schizophrenic and a homicidal risk. He was considered capable of acting in an extremely dangerous manner both to himself and to others. On May 15, 1979, the defendant was admitted to Taunton State Hospital; that hospital, in turn, referred him to Deaconess Hospital on June 7, 1979, for electric shock treatments. On July 1, 1979, the defendant was admitted to Pawtucket Memorial Hospital after slashing his wrists. From there he was transferred to Butler Hospital where reports indicate that he was suffering from depression. On July 12, 1979, the defendant was committed to Bridgewater State Hospital for observation. This commitment was the result of a criminal complaint signed by the victim.

It is deeply regrettable that although many of these hospital records indicate that the defendant was dangerous, and a suicidal or homicidal risk, no one saw fit to commit him involuntarily, see G. L. c. 123, § 12, or to warn the victim. See *Tarasoff* v. *Regents of Univ. of Cal.*, 17 Cal. 3d 425 (1976).

Relying on his extensive records and the testimony of three psychiatrists, the defendant claims that "justice demands . . . a new trial."

The Commonwealth concedes that the defendant was mentally ill, but argues that there is more than adequate evidence to support the jury's verdict. We agree. "To the extent that the evidence permitted conflicting inferences, it is for the jury to determine the issue of responsibility. There was ample lay testimony to support the jury's conclusion that [Prendergast's] conduct exhibited an ability to control his behavior and an awareness of the wrongfulness of his conduct. The testimony of the witnesses who saw [Prendergast before the offenses and] at the time of the offenses and immediately thereafter adequately rebutted the testimony of the experts on the issue of sanity." *Commonwealth* v. *Cole*, 380 Mass. 30, 37-38 (1980). The Commonwealth also had an expert opinion that Prendergast was responsible for his conduct as well as a plethora of evidence that Prendergast controlled his behavior when it suited his purposes.[19] Since "[t]he jury were correctly instructed on the law and the evidence was sufficient to support their verdict that the defendant was guilty of murder in the first degree," *Commonwealth* v. *Cadwell*, 374 Mass. 308, 320 (1978) (Quirico, J., dissenting in part), there is no reason for us to exercise our power under § 33E. We are not a second jury. We do not determine the issue of criminal responsibility.

*Judgments affirmed.*

---

[19] In addition to the evidence recited, there were numerous examples of manipulative behavior by the defendant which support the jury's verdict. For example, he stabbed himself in the stomach only after he received advice from a hospital on how it could be done without hurting himself. Further, on September 28, 1978, Prendergast created a disturbance outside the victim's place of employment. As a result Prendergast was charged with operating a motor vehicle while under the influence of drugs or alcohol and with being a disorderly person. In the judicial proceedings, Prendergast represented himself, and the cases were continued without a finding.