COMMONWEALTH *vs.* ALFRED K. BROWN.

Essex. January 5, 1982. — April 29, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Jury and Jurors. Evidence,* Admissions and confessions. *Insanity. Practice, Criminal,* Voir dire. *Homicide. Search and Seizure.*

At the trial of indictments for murder, to which the defendant had pleaded not guilty by reason of insanity, the defendant was not prejudiced by certain conversations among prospective jurors which may have identified to some of them the location of the crimes. [29-30]

On appeal of three convictions of murder in the first degree the record contained no support for the defendant's contention that, due to his youth and mental illness, he could not have understood the Miranda warnings given him before he made incriminating statements to police. [30-31]

At the trial of indictments for murder, the failure of the judge to admit psychiatric evidence at a voir dire as bearing on the voluntariness of the defendant's statements to police did not, in the circumstances, create a substantial risk of a miscarriage of justice. [31-32]

This court did not apply its conclusion in *Commonwealth* v. *Gould,* 380 Mass. 672 (1980), that a jury may consider psychiatric testimony as bearing on the issue of premeditation, to a murder trial held before its decision in that case. [32-33]

Evidence seized from an automobile pursuant to a search warrant was properly admitted at a criminal trial, where the judge correctly found that the defendant's statement which resulted in the issuance of the warrant was voluntary, and where any inaccuracy in the police affidavit was insubstantial. [33-34]

INDICTMENTS found and returned in the Superior Court Department on September 14, 1978.

The cases were tried before *McNaught,* J., and a motion for a new trial was heard by *Griffin,* J.

*Elliot M. Weinstein* for the defendant.

*Beth H. Saltzman,* Special Assistant District Attorney, for the Commonwealth.

LYNCH, J. The defendant, Alfred K. Brown, was fifteen years old when he was indicted for murder in the first degree of Wilfred, Yoshika and Dorina Brown, his parents and sister. He pleaded not guilty by reason of insanity. He was convicted of the crimes charged and sentenced to three concurrent life terms in the Massachusetts Correctional Institution at Walpole. The defendant made a timely motion for a new trial, which was denied. He contends that certain evidence was improperly admitted and he appeals the judgments of conviction and the denial of his motion for a new trial. We find no error in the convictions or the denial of the defendant's motion, and there is nothing which warrants the exercise of the powers granted us by G. L. c. 278, § 33E. We affirm the judgments of conviction.

The evidence introduced at trial tended to show the following. Alfred K. Brown was born in Salem, Massachusetts. His mother was Japanese and his father Caucasian. The defendant lived with his parents and his two older sisters in Danvers, Massachusetts, until he was about eight years old. At that time, the family moved to Japan, where the defendant spent the next seven years. In the summer of 1977, the Brown family (with the exception of the defendant's oldest sister) returned to Massachusetts and settled in Topsfield. The defendant enrolled as a member of the sophomore class at Masconomet Regional High School and began attending classes when school resumed in September, 1977.

The defendant's fellow students described him as a quiet, average student. He received average grades in his classes with the exception of a geometry class, which he failed. His teachers described him as quiet, average and shy, but not extraordinarily so. He was able, despite his shyness, to work with others. He participated in the high school photography club, and students who worked beside him in the darkroom noticed nothing unusual. None of the teachers or students who testified at trial could recollect any incidents indicating that the defendant might have been treated differently from other students because of his background.

His personal library consisted mainly of what the psychiatrist called by the defense characterized as "terrorist" books[1] and books and magazines on firearms.

In the months after the Brown family returned to Massachusetts, the defendant had entertained thoughts of suicide. He had also considered killing his parents: "The music I played was too loud, I would sleep too late and they were bugging me and I just got sick of it."[2] He said that, shortly before the shootings, "My mother was mad at me because I flunked geometry. I just got mad and decided to get it over with." When asked what his mother had said to him at the time, the defendant replied, "She said 'why don't you try harder.'"

On the evening of Friday, January 27, 1978, the defendant had just finished reading "The Glory Boys." In the final chapter the hero is executed by being shot in the head. Approximately ten minutes later, the defendant shot his mother with his .22 caliber rifle. The bullet struck her in the chin and passed through her head, killing her. The defendant's twenty year old sister had tried to escape. The defendant shot her twice in the back, twice in the chest and once in the head. When the defendant's father arrived home, the defendant shot him six times (three times in the head) because his father "drove in when I was leaving and I had to get him too." His father had time only to say, "[N]o."

On the refrigerator, near where the bodies of his mother and sister lay, the defendant wrote, "I wish to die," and signed it, "Al." He packed a suitcase with some clothing,

---

[1] The psychiatrist called by the Commonwealth characterized them as "action" books, and stated: "I believe the books had a marked influence on Alfred and were very much related to the events leading up to his being [on trial] today. . . . [T]hey were filled with large amounts of violence, where the heroes were killing, being killed. And many episodes within the books, the various people were killed by being shot in the head . . . ."

[2] Many of the statements attributed to the defendant were taken from a report made by a psychiatrist called by the defense, who read that report to the jury.

an assortment of tools, ammunition for his .22 caliber rifle and his father's .30-.30 caliber rifle and a bottle of whiskey. He took from his father's wallet his father's driver's license, pistol permit and approximately $280 in cash. He loaded the suitcase, his .22 caliber rifle and his father's rifle, "as an extra," into the trunk of one of the family's two cars, a green Plymouth automobile.

At approximately 8:30 P.M., Officer Robert T. Geary of the Topsfield police force discovered the car stuck in a snowbank in Topsfield. The motor was running, the transmission had been left in reverse (it was apparently an automatic transmission), the doors were locked, the keys were in the ignition and a snow shovel lay outside the car next to the driver's door. Geary radioed his dispatcher and ascertained that the car was registered to Wilfred Brown, the defendant's father. When the dispatcher informed Geary that no one was answering the telephone at the Brown residence, he drove there and knocked on the door. The lights were on, but no one responded. Geary returned to the Plymouth automobile, summoned a tow truck and had the car towed to the Topsfield police station.

Shortly before 8 P.M. that same evening, an off-duty Saugus police officer was driving through Topsfield in his own car when he observed a brown Ford Pinto automobile being driven erratically. The officer flashed his lights and used his horn in an unsuccessful attempt to persuade the Pinto's driver to stop. He then drove to the Topsfield police station. He described the Pinto, said that it had Massachusetts license plates containing the numerals "299," and relayed his observations. His report was received shortly after 8 P.M.

Chief Douglas Warren of the Boxford police department was driving with his wife and children at 8:10 P.M. in his family car equipped with a police radio when he heard a broadcast by the Boxford dispatcher of the information reported by the off-duty Saugus police officer. Chief Warren intercepted the Pinto and radioed ahead to Officer David French of the Boxford police department, who was stationed

in a cruiser at the Masconomet Regional High School. Officer French made an unsuccessful attempt to apprehend the driver and then, followed by Chief Warren, pursued the Pinto at speeds of over fifty miles an hour. Near the Middleton town line, the car struck two snowbanks, struck and snapped a utility pole, and tipped over onto the driver's door. The officers, afraid that the vehicle would burst into flames, immediately removed the driver.

The driver of the Pinto, identified as the defendant, struggled with the officers. Officer French handcuffed the defendant, who then became very calm. When asked, the defendant told Officer French his name. French placed him under arrest for driving while under the influence of intoxicating liquor,[3] driving to endanger and speeding. When French asked the defendant to produce his driver's license, the defendant told French that he was only fifteen years old and did not have one.

Officer French placed the defendant in the back of his cruiser and recited a partial list of the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1965).[4] French told the defendant that he had the right to take a breathalyzer test to determine whether he had been operating under the influence. French explained, in response to the defendant's question, that a breathalyzer test determines the alcohol content of the blood and that, if he passed the test, the charge of operating under the influence would be dropped. The defendant agreed to take the test. French told the defendant that he would be taken to the Topsfield police station for the test[5] and that, as soon as they reached a tele-

---

[3] The evidence indicates that the defendant's breath smelled faintly of alcohol.

[4] Officer French testified that he told the defendant: "You have a right to remain silent. Anything you say can and will be used against you in a Court of law. You have the right to an attorney, and if you can't afford one, one will be appointed for you." *Officer French did not tell the defendant that he did not have to answer questions until his lawyer was present.* See *Miranda* v. *Arizona*, 384 U.S. 436, 471 (1965).

[5] The Boxford police department did not possess a breathalyzer machine. Boxford police officers routinely took suspects to be tested by the machine located in the Topsfield police station.

phone, the defendant would have to call his parents. On route, French asked the defendant why he had his father's car. The defendant stated that there had been a fight at home and he had taken it. French also testified that, during the conversations he had with the defendant, his voice was very clear and moderately low.

When Officer French and the defendant entered the Topsfield police station at 8:50 P.M., Sergeant Arthur Heard of the Topsfield police department, the breathalyzer operator, was waiting. The defendant's handcuffs were removed and he took a seat in the main room (approximately twenty feet square) of the station. French told Sergeant Heard about the accident and the charges against the defendant.

Heard handed the defendant a legal-size sheet on which was printed (1) information about the right of a person charged with driving while under the influence to a medical examination, (2) information about the defendant's right to make a telephone call, and (3) the defendant's Miranda rights. The defendant read the information on the sheet, taking three to four minutes to do so. Heard asked the defendant if he understood what he had read; the defendant said that he did. When Heard asked if he wanted to take the breathalyzer test, the defendant agreed. At this time there were four police officers in the room: Officers French and DesMaisons, Sergeant Heard and Chief Moore, chief of the Topsfield police department. Geary also entered the room occasionally. Only Officer French was in uniform.[6]

Officer French wrote out and handed to the defendant a citation charging him with operating under the influence, driving to endanger, speeding, and driving without a license. He told the defendant, "You have to call your parents. Call them now and tell them what's happened." The defendant walked to the telephone which was on a desk in the middle of the room, and dialed a telephone number. He put the receiver to his ear, listened for five or ten seconds,

---

[6] Most of the Topsfield police force was in the building that evening attending an in-service training class on rape investigation.

then replaced the receiver and resumed his seat. Six or seven minutes later, another officer told the defendant, "Call your parents again. You have to get in touch with them." The defendant again went to the telephone, dialed a telephone number, replaced the receiver and sat down.

Sergeant Heard took the defendant into an adjoining room where the breathalyzer equipment was located and administered the test. The defendant returned to the chair in the main room. The defendant's blood alcohol content registered below .02 per cent.[7] Heard entered the main room of the station and told the defendant, that because of the test results the charge of driving under the influence would be dropped. Heard also told the defendant, however, that he would still be held on the other charges. The defendant made no comment.

Within a few minutes, at approximately 9:15 P.M., Chief Moore told the defendant that he had to use the telephone to contact his parents, and that he would not be released until he contacted his parents. Sergeant Heard, speaking at the same time as Chief Moore, also told the defendant that he must call his parents. The defendant said, "I can't contact them. They're on the floor." Officer French asked, "Who is on the floor?" The defendant replied, "My parents." French said, "What do you mean?" "I shot them," said the defendant. "You shot them with what?" asked French. "A gun." "What kind of gun?" "A .22 rifle," said the defendant. "Are they dead?" asked the officer. "Yes, I think so," was the defendant's reply. In response to another question, the defendant stated that the shootings had taken place approximately two hours earlier.

Chief Moore instructed the officers to handcuff the defendant again and to read him Miranda rights. Officer DesMaisons did so, pausing after every sentence to inquire

---

[7] See G. L. c. 90, § 24 (1) (e) (suspect not "presumed" intoxicated unless breathalyzer test registers at least .10 per cent; if less than .05 per cent, suspect is not under the influence and is to be released on that charge). See *Commonwealth* v. *Moreira*, 385 Mass. 792 (1982) ("presumption").

whether the defendant had understood; the defendant said that he did. When he had finished reading the warnings from a card, DesMaisons, the defendant and Officer French signed the card. Meanwhile, Chief Moore sent Sergeant Heard, Officer Geary and a third officer to the Brown residence, and dispatched an ambulance to the scene.

Chief Moore directed French to fingerprint the defendant, and French did so. French overheard DesMaisons ask the defendant if he had any brothers or sisters. The defendant said, "I have a sister. She's on the porch. I shot her, too." French also heard the defendant say that the guns were in the trunk of the Plymouth automobile.

Chief Moore received a call from Sergeant Heard at the Brown residence, confirming the defendant's statements. Moore then placed the defendant under arrest on three counts of murder in the first degree. He instructed the defendant not to make any statements, not to offer any information and not to answer any questions. When the defendant, responding to the Chief's question, said that he had no relatives in the area, Moore informed the defendant that he intended to call an attorney to represent him.

Chief Moore called a local attorney at approximately 9:30 P.M. The attorney arrived at the station at approximately 9:45 P.M. During that interval, Moore and other officers attempted to ascertain whether they should be looking for other victims. The defendant refused to answer their questions. When the attorney arrived, he conferred with the defendant who thereafter remained silent.

Shortly before midnight, Sergeant Heard left the Brown residence and drove to the home of the clerk for the First District Court of Essex County to obtain a warrant to search the trunk of Wilfred Brown's Plymouth, which had been towed to the Topsfield police station earlier that evening. In his affidavit in support of the application for the search warrant, Sergeant Heard set forth the statements made by the defendant about the shootings and added the following sentence: "[The defendant] further states that he shot [the victims] with a gun which was in the trunk of his father's

1972 Plymouth [automobile] Mass. registration 246 AKY."
A search warrant was issued, pursuant to which officers
opened the trunk of the Plymouth automobile and found,
among other things, the defendant's .22 caliber rifle, his
father's rifle, the suitcase packed with clothing and ammu-
nition for the guns. Tests of the .22 caliber rifle revealed
that it was the gun used in the shootings. The contents of
the car's trunk subsequently were introduced in evidence.

Trial commenced on February 5, 1979, in the Superior
Court in Essex County. The Commonwealth called as wit-
nesses all the police officers who had spoken to the defend-
ant during the events described above. The officers all
testified that, during the time the defendant was in the
police station, he appeared sober and was very calm. His
voice was clear and low. When the defendant stated that
he had killed his parents, his voice rose a little; otherwise, he
spoke without expression. He voiced no regrets. The de-
fendant did not complain while in the station. He did not
ask for food or water and did not ask to use the toilet facili-
ties. He understood English, spoke well and was coopera-
tive. Chief Moore testified that the defendant seemed a
normal, intelligent youngster when he came to the police
station in August, 1977, with his father to obtain a firearm
identification card[8] and was "normal" — and still sane —
on the night of the shootings. Officer French opined that
the defendant was sane on that evening. Various school-
mates and teachers testified, as summarized above, that the
defendant appeared to be normal and intelligent.

After the Commonwealth rested, the defense put on its
sole witness, a psychiatrist who had met with the defendant
on two occasions shortly after his arrest and had spoken
briefly with the defendant's surviving sister. This witness
read a report to the jury which she had prepared not long
after examining the defendant.

---

[8] See G. L. c. 140, §§ 129B and 129C; G. L. c. 269, § 10. The defend-
ant was required to obtain this certificate in order to possess a rifle.

The defendant told this psychiatrist that "he didn't see anything wrong with murder or anything like that." He said that he had killed his mother after a discussion of a failing grade, believing, "[T]hat would stop her from bugging me." The psychiatrist wrote (and repeated at trial) that, "[a]sked directly whether he regretted having done it, he said he 'guessed so' — 'since I got stuck in this place.' Asked whether there was any act he would consider immoral or wrong, [the defendant] said 'Yes, if I'd sat around and watched them die — if it wasn't quick — it would be morally wrong; but I made sure they were dead — if they're dead they can't bug you about your grades.'" The defendant understood that his feeling about killing was unusual, and said that "since I would (still) kill if I got in a fight, they wouldn't want me on the street."

The defense expert opined that the defendant, although competent to stand trial,[9] was "seriously mentally ill" with paranoid schizophrenia and that, "[a]lthough he may have had substantial capacity to appreciate the criminality of his conduct," she believed that "he did not have the capacity at the time of the shootings to conform his conduct to the requirements of the law. His mental illness deprived him of the power to make the right choices governing his behavior." In her report she added, however, that "[t]his diagnosis could be debated." At trial, the psychiatrist stood by her earlier diagnosis.

The Commonwealth called in rebuttal a second psychiatrist who had interviewed the defendant at least eight times over a period of one year, had read the police reports and visited the scene of the shootings three times, and had talked to the defendant's surviving sister on at least twenty occasions. He had also reviewed medical and psychiatric reports prepared by the staffs of two institutions to which the defendant had been sent for observation and examination.

---

[9] This psychiatrist stated that the defendant "understands the nature of the charges, can consult and advise his lawyer and can understand his rights if explained to him . . . ."

The Commonwealth's expert stated that extensive examinations of the defendant revealed that he suffered from no physical abnormalities, that he had experienced no hallucinations and was in contact with reality, that he was very cooperative and of above average intelligence. The psychiatrist found the defendant to be suffering from mental illness, which he diagnosed as latent schizophrenia, but "did not find sufficient evidence of mental disease or defect to take away criminal responsibility."

The trial judge instructed the jury that they must find the defendant either guilty of murder in the first degree, guilty of murder in the second degree, not guilty, or not guilty by reason of insanity. With regard to the statements made by the defendant in the Topsfield police station, the judge instructed the jury that they must determine, in order to consider those statements in their deliberations, "[f]irst . . . that Mr. Brown made a statement. Secondly, you have to find that the statement consisted of particular words. Thirdly — and terribly important — you must find that the statement was made voluntarily. And fourthly — and terribly important — you must find that the statement was the product of a free and rational intellect. Otherwise you may not consider it at all." The judge told the jury that, as they might have surmised,[10] there had been a preliminary hearing to determine whether they could hear the defendant's statements. The judge reiterated, however, that "whether you accept or reject that testimony is for you and for you alone."

Immediately thereafter, the judge repeated the four findings that the jury must make in order to consider the defendant's statements. He told them that, "[b]efore accepting a statement as the basis of an inference [that the defendant committed a crime], you must be satisfied beyond a reason-

---

[10] Officer French's testimony had been interrupted and the jury asked to leave the courtroom briefly just as he was about to testify regarding the defendant's statements about the shootings. The officer resumed his testimony and related the statements when the jury returned.

able doubt that it was a reflection of free will and intellect."
He explained that a statement does not reflect free will or
intellect if the speaker's self-protective instincts have been
overridden by force, fraud, compulsion or fear. He con-
cluded by stating that "[t]he jury must determine whether
in fact any statement was made by [the defendant] on
January 27, 1978; and if it was made, whether it was volun-
tary, whether it was rational, and what was its ultimate ef-
fect."

The judge also instructed the jury that they could find the
defendant guilty of murder in the first degree of both Wil-
fred Brown and Dorina Brown, if they found that the de-
fendant had killed those victims either with deliberately
premeditated malice aforethought or with extreme atrocity
or cruelty, but that they could not find the defendant guilty
of murder in the first degree of Yoshika Brown (his mother)
on the ground that her murder was committed with extreme
atrocity or cruelty.[11] He carefully explained the concept of
deliberately premeditated malice aforethought. He also in-
structed the jury that they could find the defendant not
guilty if they found that the Commonwealth had not sus-
tained its heavy burden of proof.

With regard to the defendant's insanity defense, the
judge properly instructed the jury that "[a] defendant is not
[criminally] responsible if, as a result of either mental dis-
ease or defect, that person lacks . . . substantial capacity
either to appreciate the criminality or wrongfulness of his
conduct, or lacks substantial capacity to conform his con-
duct to the requirements of the law."[12] He told the jury
that the prosecutor bore the burden of proving, beyond a
reasonable doubt, that the defendant was criminally re-

---

[11] See *Commonwealth* v. *Eisen*, 358 Mass. 740, 746-747 (1971), and
cases cited. Since Yoshika Brown died from a single bullet through her
head, and her body showed no other signs of injuries, the judge correctly
instructed the jury that they could not find that her murder was commit-
ted with extreme atrocity or cruelty.

[12] This is the standard for determining criminal responsibility adopted
in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967).

sponsible at the time of the shootings. The judge explained that if the jury found the defendant not guilty, by reason of insanity, of causing the death of one of the victims, they must so find with respect to the deaths of all three victims.

The jury returned verdicts of guilty of murder in the first degree on each of the three indictments, impliedly finding that the defendant was criminally responsible at the time of the shootings. The judge sentenced the defendant, as the law requires, to imprisonment for life on each conviction. He ordered the terms to be served concurrently.

On March 7, 1979, the defendant filed a claim of appeal and a motion for a new trial. In support of his motion, the defendant argued that he was deprived of a fair trial because of certain conversations that had occurred between potential jurors during the jury selection process. He also argued that his convictions were against the weight of the evidence. The motion was heard by another judge of the Superior Court (motion judge), the trial judge having resigned from the Superior Court bench. The motion judge denied the defendant's motion, and the defendant appealed.

1. *Jury contamination.* The alleged jury contamination is based on conversations among members of the jury pool that were brought to the attention of the judge as the jury were being empanelled. In one conversation, a member of the jury pool commented to another member that she had lived close by but had not known the family. The second member responded, "[W]e're not supposed to talk," and walked away. The second member was not challenged and was subsequently seated as a juror. Another incident involved someone in the jury pool asking another member whether she had read about the case. The judge thereupon questioned the entire jury pool and excused the juror reporting the incident. At the end of the day, the judge repeated his warnings not to talk about the case to any potential jurors.

Two days later, while the empanelment was still underway, two other members of the jury pool reported overhearing conversations about the locale of the shootings. The

entire jury pool were questioned again about the conversations.

A trial judge has broad discretion to determine whether exposure to extraneous information about a case may have so influenced potential jurors that a new trial should be granted. Compare *Commonwealth* v. *Richard*, 377 Mass. 64, 66 (1979), with *Commonwealth* v. *French*, 357 Mass. 356, 401 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972). Unless the trial judge's decision has operated injuriously to a defendant, has tended to an erroneous verdict, or has otherwise worked an injustice, we will not find an abuse of that discretion. See *Commonwealth* v. *Grace*, 370 Mass. 746, 754 (1976).

The judge's careful inquiries revealed that, at most, the location of the scene of the shootings may have been suggested to some prospective members of the jury. The defendant, however, pleaded not guilty by reason of insanity. The location of the scene of the shootings is immaterial to his defense as presented. The record does not demonstrate the existence of pretrial publicity of the magnitude and nature described in *Estes* v. *Texas*, 381 U.S. 532 (1965), and other cases cited by the defendant. There is ample support for the motion judge's finding that there were no grounds to believe that the incidents reported were prejudicial to the defendant, and therefore the motion judge did not abuse her discretion in denying the defendant's motions for a new trial.

2. *Voluntariness of the defendant's confession.* The trial judge denied the defendant's motion to suppress the statements he made to police officers in the Topsfield police station. The defendant asserts that this was error because he did not knowingly and intelligently waive his Miranda rights before making those statements.

The defendant received Miranda warnings three times in the course of the evening the shootings occurred. Officer French first gave him a partial list of the warnings after he had placed the defendant in the police cruiser at the scene of

the automobile accident. Between that time and the time the defendant read the complete list of Miranda warnings from the list handed to him by Sergeant Heard, the defendant (as the judge found) said nothing incriminating.

The defendant's principal contention is that, since he was only fifteen years old and insane, he could not have understood the Miranda warnings which, as the trial judge found, he had read. The only evidence in support of his contention is that he made incriminating statements after having read the warnings. The record contains no indication that the defendant was incapable of understanding the import of what he had read, and considerable evidence to the contrary. The defendant is intelligent. He appeared extremely calm that night. There is no hint that the statements he made were coerced. The jury found him to be criminally responsible with respect to events which occurred only two hours earlier. The judge found that there was no violation of the defendant's Fifth Amendment privilege against self-incrimination. We agree with that finding.

3. *Admission of psychiatric evidence at voir dire.* During a voir dire of Officer French the defendant's trial counsel argued that the statements made by the defendant in the police station were inadmissible. The defendant asserts that the judge erred in failing to admit psychiatric evidence of the defendant's mental illness as bearing on the voluntariness of his statements to police. The defendant's trial counsel did not clearly offer to introduce such evidence at that time,[13] nor did he object to its exclusion. The ques-

---

[13] THE JUDGE: "I think the jury [are] entitled to hear precisely what went on inside at the police station."

DEFENSE COUNSEL: "All right, Your Honor. I have one additional problem in relation to that; something that can only be viewed at that time retrospectively, which would be evidence as to his insanity, which I intend to present in this case. And I don't know how you can rule on that, Your Honor, at this point, without having heard some evidence as to that."

THE JUDGE: "What is that?"

DEFENSE COUNSEL: "Well, if in fact — and I do suggest to this Court that I intend to offer evidence that this boy was suffering from paranoid

tion before us, therefore, is whether the judge's decision to admit the defendant's statements created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Bertrand*, 385 Mass. 356, 361 (1982), and cases cited. We find none. All the defendant's psychiatric evidence was presented to the jury. The jury were thrice instructed, under our "humane" practice (see *Commonwealth* v. *Cole*, 380 Mass. 30, 41-42 & n.14 [1980]), that they could not consider the statements allegedly made by the defendant without first determining that those statements were both voluntarily made and the product of a free and rational intellect. We hold that, in the circumstances of this case, this was sufficient to prevent a miscarriage of justice.

4. *Failure to instruct the jury specifically to consider psychiatric evidence on the issue of deliberate premeditation.* The defendant asks this court, in light of our recent decision in *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), to reverse the motion judge's decision denying the defendant's motion for a new trial. In *Gould*, this court concluded that psychiatric testimony may properly be offered regarding a defendant's mental illness as that evidence bears on the issues both of premeditation and of extreme atrocity or cruelty. *Id.* at 682-683.

*Gould* was decided after the judgments of conviction were entered against the defendant in this case. The court has thrice declined to apply the *Gould* decision retroactively. *Commonwealth* v. *Prendergast*, 385 Mass. 625, 634-635 (1982). *Commonwealth* v. *Chubbuck*, 384 Mass. 746, 756-757 (1981). *Commonwealth* v. *Shelley*, 381 Mass. 340, 354-355 (1980). Cf. *Commonwealth* v. *Perry*, 385 Mass. 639, 648-649 (1982) (request for *Gould* instruction denied). Here, as in *Shelley*, the defendant had no history of psychiatric problems before the shootings occurred, the

schizophrenia — I'm wondering if any admonition [i.e., the Miranda warnings] would have any reasonable or legal effect upon him."

THE JUDGE: "I don't think the admonition has anything to do with the defense of criminal responsibility at all at this point . . . ."

record does not reveal that he sought a charge on the issue of deliberate premeditation, and he took no exception to the judge's failure to instruct the jury that they might consider the defendant's mental state on these issues. This is not a case that requires the retroactive application of the rule set forth in *Gould*.

5. *Admission of evidence seized pursuant to a search warrant.* The defendant moved to suppress the evidence (suitcase, rifles, ammunition and other articles) found in the trunk of Wilfred Brown's Plymouth automobile after the car was searched pursuant to a warrant. The motion was denied and the evidence was admitted at trial over the defendant's objections. He argues, on appeal, that this evidence is "fruit of the poisonous tree" under the doctrine enunciated in *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963), because the search warrant was obtained as a result of a confession made by the defendant after he was questioned in violation of his Fifth Amendment rights. We agree with the express findings of the judge, and the implied finding of the jury, that the defendant's Fifth Amendment rights were not violated, and that his statement was voluntary. That statement properly was used in Sergeant Heard's affidavit in support of his application for a search warrant.

The defendant also argues that Sergeant Heard's affidavit contains a crucial misrepresentation of fact, i.e., the sentence: "He [the defendant] further states that he shot them with a gun which was in the trunk of his father's 1972 Plymouth Mass. registration 246 AKY." Testimony was given at trial to the effect that the defendant stated only that the guns were in the trunk of the Plymouth automobile; no witness testified that he told police officers the car's registration number.

The defendant did not take the preliminary steps necessary to obtain a pretrial hearing on this issue. See *Franks* v. *Delaware*, 438 U.S. 154, 155-156 (1978); *Commonwealth* v. *Nine Hundred and Ninety-two Dollars*, 383 Mass. 764 (1981). Furthermore, the defendant makes no showing here that the registration number of the car was not

obtained from him in some conversation not in evidence. Even if the registration number was not obtained from the defendant, the suppression of the evidence obtained as a result of the warrant would not be required. The defendant has not argued that this information was incorrect or obtained illegally. If the registration number was not obtained from the defendant, the disputed sentence could be characterized as, at worst, an inconsequential inaccuracy. Such a showing does not entitle the defendant to a suppresion of evidence. *Id.* at 767.

6. *Extraordinary relief under G. L. c. 278, § 33E.* The defendant directs our attention to the facts underlying his claims of error in seeking relief under G. L. c. 278, § 33E. He asks us to consider especially the issues involving his mental state as that bears on the voluntariness of his statement to police officers, and on the implied finding of premeditation which the jury must have made before returning verdicts of guilty of murder in the first degree.

The jury found the defendant criminally responsible. The facts before them were more than sufficient to sustain such a finding. The defendant's trial counsel, the prosecutor and the judge all acted fairly, competently and in accordance with the law. We have examined the entire record and considered the facts carefully. We feel that justice does not require the granting of a new trial or the entry of verdicts of lesser degrees of guilt.

*Judgments affirmed.*
*Order denying motion*
*for new trial affirmed.*