MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
ADVISORY BOARD & others *vs.* MASSACHUSETTS
BAY TRANSPORTATION AUTHORITY & others.

Suffolk.   November 22, 1980. — February 12, 1981.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Massachusetts Bay Transportation Authority,* Budget, Advisory board, Federal assistance. *Governor. Statute,* Construction. *Constitutional Law,* Expenditure of money, Separation of powers of government. *Practice, Civil,* Deferral of judicial remedy.

A judge of the Superior Court had no authority under G. L. c. 231A, § 3, to make a "preliminary declaration" of rights as to the validity of an executive order issued by the Governor [573-574]; however, where the validity of the order was fully argued on the merits before this court and did not depend on any disputed matters of fact, this court treated the plaintiffs' request for a prompt declaration of rights as a motion for partial summary judgment in order to avoid rendering a decision that was merely tentative [574-575].

The provisions of G. L. c. 161A, § 29, authorizing and directing the Massachusetts Bay Transportation Authority "to take all necessary action to secure any federal assistance" do not override c. 161A, § 5 (*i*), which prohibits the authority from making expenditures in excess of its budget.  [575-576]

The Governor was not authorized by G. L. c. 161A, § 20, by St. 1950, c. 639, as amended, or by executive powers inherent in his office to suspend by executive order the operation of G. L. c. 161A, § 5 (*i*), or to take possession of the lines and facilities of the Massachusetts Bay Transportation Authority because of an anticipated interruption of public transportation resulting from a budget dispute [576-578]; in the circumstances, however, this court permitted the Governor to continue to operate the authority under executive order for the brief period necessary to convene the Legislature and to give the Legislature an opportunity to consider what action it deemed appropriate [578-579].

CIVIL ACTION commenced in the Superior Court Department on October 31, 1980.

*Stephen S. Ostrach,* Assistant Attorney General (*Donald K. Stern & William L. Pardee,* Assistant Attorneys General, with him) for the Governor & another.

*Joseph H. Elcock* (*Ronald G. Busconi* with him) for the Massachusetts Bay Transportation Authority & others.

*Herbert P. Gleason* (*Thomas H. Martin & John F. Maher* with him) for the Massachusetts Bay Transportation Authority Advisory Board.

BRAUCHER, J.  On November 18, 1980, the Governor of the Commonwealth issued Executive Order 189, proclaiming the existence of an emergency, taking possession of the lines and facilities of the Massachusetts Bay Transportation Authority (MBTA), and authorizing the Board of Directors of the MBTA to operate those lines and facilities.  The present case was argued before the full court on November 22, 1980, and on November 28, 1980, we ordered the entry of a partial summary judgment declaring that "(1) Executive Order 189, except as stated below, is beyond the powers granted to the Governor and is of no force or effect. (2) Pursuant to Executive Order 189, the MBTA may continue to operate until 12:00 P.M. on Friday, December 5, 1980."  Two Justices saw no justification for authorizing the continued operation of the MBTA beyond 12:00 P.M. on Tuesday, December 2, 1980, since "the Legislature, on its convening, promptly may pass legislation authorizing the continued operation of the MBTA, while the Legislature deliberates on other matters concerning the MBTA."  We said that an opinion or opinions would follow, and we now issue our opinion.

1. *The proceedings.*  On October 31, 1980, the MBTA Advisory Board filed in the Superior Court a complaint against the MBTA, its Board of Directors and Treasurer-Controller, and Barry M. Locke, and the Treasurer and Receiver General of the Commonwealth, seeking declaratory and injunctive relief.  On November 10, 1980, a judge of

382 Mass. 569                                                    571

Massachusetts Bay Transp. Auth. Advisory Bd. v. Massachusetts Bay Transp. Auth.

that court issued a preliminary injunction against the defendants other than the Treasurer and Receiver General. Those defendants were enjoined from (1) certifying or charging to the Treasurer and Receiver General any sums attributable to the MBTA net cost of service which derived from expenditures in excess of $302,130,152, and (2) expending or authorizing expenditures attributable to MBTA operations during the calendar year 1980 in excess of $302,130,152. Part (2) of the injunction was stayed until 12:00 P.M., Sunday, November 30, 1980. The order was affirmed by a single justice of the Appeals Court and by a single justice of this court.

The amount of the budget for calendar year 1980, approved by the Advisory Board pursuant to G. L. c. 161A, § 5 (*i*), was $302,130,562,[1] and it was estimated that at its current rate of expenditure the MBTA would exceed that amount on Wednesday, November 12, 1980. On November 16, the Advisory Board met and voted not to approve any supplementary budget; on November 17 the General Court met in special session to consider MBTA questions, but took no action. On Tuesday, November 18, the Governor issued Executive Order 189, which limited MBTA expenditures to "$41,000,000 over the currently approved budget." On November 19 the Advisory Board filed an amended complaint, adding twenty-seven individual taxpayers as plaintiffs and adding the Governor as a defendant.

On Friday, November 21, 1980, after hearing, the judge dictated a "memorandum of decision." He declared that the injunction previously issued would remain in effect but would not apply to the defendants acting as "agents of the Commonwealth under the authority of the Governor." He denied further injunctive relief, but made "a preliminary declaration of the rights of the parties," that "it is reasonably likely that, upon the trial of this matter, it will be declared that: 1. Executive Order 189 is unlawful as being beyond the powers granted to the Governor and is, there-

---

[1] The discrepancy of $410 is not explained.

fore, of no force and effect. 2. Neither agents of the Commonwealth nor of the MBTA have any present power to incur obligations on behalf of the MBTA beyond its authorized budget or on behalf of the Commonwealth for the account of the MBTA beyond its authorized budget. 3. Any such obligations incurred in excess of monies appropriated therefor appear to impose the risk that . . . there may well be no liability on the Commonwealth pursuant to General Laws, Chapter 29, Section 26."

At the suggestion of the judge, a single justice of this court issued an order the same day transferring the case to the county court pursuant to G. L. c. 211, § 4A, for preparation of the record on the MBTA's appeal to the full court from the order of November 21, 1980. By a separate order the single justice reserved and reported that order without decision for argument before the full court on Saturday, November 22, 1980. On that day, after argument, a majority of the full court ordered that the "preliminary declaration" entered in the Superior Court on November 21 be vacated.

On November 28, 1980, the full court issued its order for partial summary judgment, to be entered in the Supreme Judicial Court for Suffolk County.[2]

2. *The facts.* On the basis of the verified complaints, supporting affidavits, and representations of counsel, the judge found that there was a reasonable likelihood that the Advisory Board could establish the following facts at trial, and those facts were not disputed in argument before us. The Advisory Board originally approved an MBTA budget of $302,130,562 for the calendar year 1980. After negotiations over a period of several weeks, the MBTA on August 19, 1980, requested a supplemental budget of $41,000,000. The executive committee of the Advisory Board voted on September 3, 1980, not to increase the

---

[2] Subsequent to our order, the Legislature met in special session. The MBTA ceased to operate after Friday, December 5, 1980, but on December 7, 1980, the Legislature authorized the MBTA Board of Directors to restore budget reductions but not to exceed the total sum of $343,166,846. St. 1980, c. 581, § 18. Operations were promptly resumed.

382 Mass. 569                                    573

Massachusetts Bay Transp. Auth. Advisory Bd. *v.* Massachusetts Bay Transp. Auth.

budget, and the executive director of the Advisory Board sent a letter to the Governor and the MBTA on September 5, 1980, giving notice of that action. On September 15, 1980, the Advisory Board met and confirmed the action of its executive committee. The judge ruled that the September 5 letter satisfied the notice requirement of G. L. c. 161A, § 7, and that ruling was not contested before us.

Early in November, the MBTA had overspent some line items in the approved budget, and it would exceed the aggregate amount authorized on November 12. The annual deficit of the MBTA, defined as the "net cost of service" in G. L. c. 161A, § 1, is certified to the Treasurer and Receiver General. G. L. c. 161A, § 12. He subtracts State and Federal assistance payments and assesses the balance on the seventy-nine cities and towns in the MBTA district in accordance with formulas set out in G. L. c. 161A, §§ 8-11. Realistically, the judge said, there would be no hope that the cities and towns could recover funds illegally spent by the MBTA and assessed on them. Thus the Advisory Board and its constituent cities and towns would be irreparably injured if the MBTA spent funds beyond those authorized.

On November 18, 1980, there was an imminent risk of a slowdown, interruption or stoppage of service of the MBTA. Such an event, as the Executive Order recited, would cause the highways of the Commonwealth in the areas of metropolitan Boston to become so clogged with traffic during a substantial part of the day that the passage of fire fighting equipment, police, ambulances, vehicles used for the transportation of food and other essential vehicles would be impeded, thus endangering the health, safety and property of the citizens of the Commonwealth by increasing the likelihood of damage to property and loss of life because of fire and by creating serious shortages of foods. These events threatened the availability of essential services of transportation to such an extent as to endanger the health, safety and welfare of the community.

3. *Jurisdiction.* In the Superior Court the plaintiffs argued that the validity of Executive Order 189 was subject to

judicial review. The Governor and the Treasurer and Receiver General (the State defendants) resisted both injunctive and declaratory relief on a variety of grounds, including an argument that the Governor is not a proper party to this action, citing *Rice* v. *The Governor,* 207 Mass. 577, 579 (1911), and G. L. c. 231A, § 2, as amended by St. 1974, c. 630, § 1. No injunctive relief was granted with respect to the Executive Order, but after the case was transferred to this court the State defendants moved to vacate the "preliminary declaration" entered in the Superior Court, "since the practical effect of that declaration is that the Massachusetts Bay Transportation Authority may cease operations as early as Monday, November 24, 1980." Immediately after argument, a majority of this court ordered that the "preliminary declaration" be vacated, emphasizing that no view was expressed as to the correctness of the rulings of the Superior Court. We now add that we find no authority for such a "preliminary declaration." Under G. L. c. 231A, § 3, as amended by St. 1974, c. 630, § 2, it is a sufficient reason for denying declaratory relief that the declaration "if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceedings."

After argument the plaintiffs submitted a memorandum asserting that relief was being "sought, anomalously, by the parties who prevailed in the Superior Court," and that there was confusion "as to what, exactly, was before the Court." The memorandum stated that the plaintiffs would treat any matter comprehended by the order of November 21, 1980, as susceptible to consideration by this court. The State defendants took the same view, and the validity of Executive Order 189 was fully argued on the merits. We considered the case on that basis, and did not address any jurisdictional issue.

We noted that the questions of the validity and effect of Executive Order 189 did not depend on any disputed matters of fact, and that identical questions with respect to the validity and effect of Executive Order 172, issued December 18, 1979, had been fully briefed and argued by some of

the same parties and by the same leading counsel in November, 1980. To avoid rendering a decision that was merely tentative, we treated the request of the plaintiffs for a prompt declaration of rights as a motion for partial summary judgment, and allowed the motion. Mass. R. Civ. P. 56 (a), 365 Mass. 824 (1974).

4. *Federal requirements.* The MBTA statute, G. L. c. 161A, provided in § 5 (*i*), as amended by St. 1975, c. 205: "All current expenses of the authority shall be in accordance with an itemized budget. . . . The budget shall govern the current expenses of the authority during such calendar year. No such expenses may be incurred in excess of those shown in the budget, . . ." See *Boston* v. *Massachusetts Bay Transp. Auth.,* 373 Mass. 819, 823-824 (1977); *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 543-546 (1965). The MBTA argued that those provisions were overridden by § 29, added by St. 1964, c. 563, § 18, which "authorized and directed" the MBTA and other State agencies "to take all necessary action to secure any federal assistance which is or may become available to the commonwealth or any of its subdivisions for any of the purposes of this chapter. . . . It is the intent of this section that the provisions of any federal law, administrative regulation or practice governing federal assistance for the purposes of this chapter shall, to the extent necessary to enable the commonwealth or its subdivisions to receive such assistance and not constitutionally prohibited, override any inconsistent provisions of this chapter."

The judge, in issuing a preliminary injunction on November 10, 1980, rejected that argument, and that action was not reported to this court. In his "memorandum of decision" of November 21, 1980, he did not discuss the issue, and it did not affect the "preliminary declaration" he then made. The MBTA argued to us, nevertheless, that the issue was before us, since the November 21 memorandum continued in effect the November 10 injunction. The State defendants did not address the issue, and it did not affect our decision. But we have no doubt that the judge correctly rejected the MBTA argument, and we now state our reasons.

As the judge recognized, the MBTA is the recipient of significant Federal assistance pursuant to the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1601 et seq. (1976). Under the provisions of the Federal grants, the Commonwealth was required to maintain a level of effort and expenditure not less than the average of the funds expended on mass transit during the previous two fiscal years. 49 U.S.C. § 1604 (f) (1976). The MBTA budget complied. But the MBTA also gave assurances that it would "provide for the continued or improved operation of the system," and the operating grant contracts provided for reductions in Federal assistance in the event State and local funding or service levels were reduced.

Thus a reduction or cessation of service would jeopardize Federal funding for the MBTA. Nevertheless, we agree with the judge that G. L. c. 161A, § 29, did not authorize expenditures in excess of budget and thus contrary to G. L. c. 161A, § 5 (*i*). A contrary conclusion would render the budget review responsibility of the Advisory Board a nullity and would trespass on the exclusive legislative power to appropriate money. The effect of the budget on prospects of Federal assistance was a matter to be considered by the Advisory Board, but the Federal statute, regulations and contracts could not authorize expenditure of State funds contrary to § 5 (*i*). See *Opinion of the Justices,* 302 Mass. 605, 614 (1939); *Opinion of the Justices,* 294 Mass. 616, 621 (1936).

5. *Seizure under the MBTA statute.* The State defendants argued that the Governor's action was authorized by G. L. c. 161A, § 20.[3] The plaintiffs responded that that

---

[3] As inserted by St. 1964, c. 563, § 18: "Notwithstanding any contrary provision of law, whenever there exists a continued interruption, stoppage or slowdown of transportation of passengers on any vehicle or line of the authority or a strike causing the same, and which is in violation of an injunction, a temporary injunction, a restraining order, or other order of a court of competent jurisdiction, and which threatens the availability of essential services of transportation to such an extent as to endanger the health, safety or welfare of the community, the governor may declare that an emergency exists. During such emergency he may take possession of, and operate in whole or in part, the lines and facilities of the authority in

section is limited to cases of labor disputes. The judge rejected the plaintiffs' argument, in accordance with the plain meaning of the statutory language, which covers "a continued interruption . . . *or* a strike causing the same" (emphasis supplied). He ruled that the language of the statute "encompasses the possibility of riot, severe vandalism, and the like." But, he ruled, the comma preceding the first "and which" clause made it clear that both "and which" clauses were applicable both to a "strike" and to any other "continued interruption." Hence, he ruled, the section applies only if the interruption, stoppage and slowdown is in violation of a court order. Since there was no such court order, the statute did not apply.

We agree with the judge's conclusion, though not with the stress he placed on the comma. A strictly grammatical reading, comma or no comma, would treat the two "and which" clauses as parallel to the preceding phrase, "causing the same." All three parallel modifiers would then modify only "strike," not "interruption, stoppage or slowdown." So read, however, the sentence seems peculiar, since the second "and which" clause, defining the threat that creates the emergency, ties into the following sentence and seems properly applicable to any covered case. Any ambiguity is resolved by the legislative history. As proposed by the Governor, the section bore the caption "Interruption, Stoppage or Slowdown of Transportation Service in Violation of Injunction: Emergency Powers of Governor." 1964 Senate Doc. No. 830. 1964 House Doc. No. 3646. All section captions were deleted from the statute as enacted, but the text of § 20 was not changed. Thus we conclude, as did the judge, that the section has no application unless there is a violation of a court order.

---

order to safeguard the public health, safety and welfare. Such power and authority may be exercised through any department or agency of the commonwealth or through any person or persons and with the assistance of such public or private instrumentalities as may be designated by him. Such lines and facilities shall be operated for the account of the authority. The powers hereby granted to the governor shall expire forty-five days after his proclamation that a state of emergency exists."

6. *The civil defense statute.* Executive Order 189 also invoked St. 1950, c. 639, as amended (the civil defense statute). The recitals in the Executive Order follow the language of a clause added by St. 1958, c. 425, § 1: "whenever because of absence of rainfall or other cause a condition exists in all or any part of the commonwealth whereby it may reasonably be anticipated that the health, safety or property of the citizens thereof will be endangered because of fire or shortage of water or food"; the Governor may proclaim an emergency. The 1958 amendment bore the title "An Act authorizing the governor to deal with the threat of danger by drought." We do not think the Legislature intended to cover such an "other cause" as a budget dispute leading to an interruption of public transportation.

7. *The Governor's inherent powers.* Finally, Executive Order 189 invoked "any other powers vested in me [the Governor] under the Constitution of the Commonwealth, or otherwise." The Governor is the "supreme executive magistrate" of the Commonwealth. Part II, c. 2, § 1, art. 1, of the Constitution of the Commonwealth. See *Opinion of the Justices,* 375 Mass. 827, 833 (1978). We have recognized the existence of executive powers inherent in the office of Governor. See *Opinion of the Justices,* 368 Mass. 866, 875 (1975). The State defendants contended that Executive Order 189 was a proper exercise of such a power.

That contention fails. "The power of suspending the laws, or the execution of the laws, ought never to be exercised but by the legislature, or by authority derived from it, to be exercised in such particular cases only as the legislature shall expressly provide for." Art. 20 of the Declaration of Rights of the Massachusetts Constitution. The Governor could not by executive order, in the absence of legislative authority, suspend the operation of G. L. c. 161A, § 5 (*i*). Nor could we. See *Commissioner of Pub. Health* v. *Bessie M. Burke Memorial Hosp.,* 366 Mass. 734, 741 (1975).

On the other hand, we recognize, as did the Superior Court judge, that the Governor was confronted by the prospect of a public disaster. The continued operation of the

MBTA involved the expenditure of funds in violation of § 5 (*i*), and thus intruded upon the power of the Legislature to control expenditures. Unless expenditures were authorized by the Advisory Board, authority could be granted only by the Legislature with the approval of the Governor. But as a practical matter, notwithstanding violation of § 5 (*i*), funds would continue to be expended in order to shut down the operation of the MBTA in a manner consistent with the preservation of its immensely valuable rolling stock and other property. Resolution of the underlying political problems had no doubt been delayed by the legal uncertainties and the time needed, even with expedited proceedings, to obtain an authoritative decision. The Legislature was no longer in session, and it would need time to consider the alternatives.

In such circumstances deferral of coercive judicial remedies to permit action by the appropriate branch of government is a familiar expedient. See, e.g., *Hallenborg* v. *Town Clerk of Billerica*, 360 Mass. 513, 519-520 (1971). In *Reynolds* v. *Sims*, 377 U.S. 533, 585-587 (1964), the Supreme Court of the United States approved the action of a lower court in ordering into effect an invalid plan for legislative apportionment as a temporary and provisional measure, in order to give the responsible State Legislature an opportunity to remedy constitutional deficiencies. Accordingly, we expressed the view that "the Governor must have power to continue the operation [of the MBTA] for the period necessary to convene the Legislature and for consideration of such action as it deems necessary to authorize expenditures either to shut down or to continue the operation, and otherwise to regulate the operation of the MBTA."

We were in agreement that the Governor's power to continue MBTA operations would cease when the necessity ceased, and two Justices thought it would cease at 12:00 P.M. on Tuesday, December 2, 1980. In the opinion of a majority of the court, however, the Legislature would need until 12:00 P.M. on Friday, December 5, 1980, for its deliberations, and our judgment permitted operation until the later time.