Commonwealth vs. Peter P. Bianco
(and thirteen companion cases[1]).

Berkshire.  October 5, 1982. — March 9, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*Homicide. Assault and Battery. Joint Enterprise. Practice, Criminal,*
Appeal, Fair trial, Severance, Continuance, Venue, Examination of
jurors, Sequestration of witnesses. *Jury and Jurors.*

At a manslaughter trial which had proceeded on the theory that the seven
defendants were engaged in a joint enterprise to beat the two victims,
in revenge for an attack by the victims earlier the same evening, and
that the victims, in an attempt to escape the attack, jumped into the
automobile which one of the victims had been driving and which im-
mediately plunged into a lake, resulting in the death of both by
drowning, there was insufficient evidence to establish beyond a
reasonable doubt that the assault and battery was the cause of the vic-
tims' entering the automobile, rather than attempt to prevent further
harm to the car.  [362-364] LIACOS, J., dissenting.

Where issues respecting convictions on indictments for assault and battery,
which had been placed on file with the defendants' consent, had been
fully argued on their appeal from convictions of manslaughter which
arose from the same trial and which were reversed on appeal, this
court considered the assault and battery convictions in the interest of
judicial economy.  [364-365]

At the trial of seven defendants on indictments charging manslaughter
and assault and battery, no violation of the defendants' confrontation
rights under the Sixth Amendment to the Federal Constitution resulted
from the admission in evidence of statements by several of the defend-
ants to police, with jury instructions that each statement was to be

---

[1] Seven defendants, Peter P. Bianco, Todd Terpak, Joseph F. Burke,
Robert Walker, Bruce C. Kern, Mark E. Hinman, and Stephen Piretti,
were tried together on twenty-eight indictments.  Each defendant was
tried on two indictments charging involuntary manslaughter and two in-
dictments charging assault and battery.  Each defendant was acquitted
on one indictment of assault and battery.  The fourteen involuntary man-
slaughter convictions are before us on appeal.  We also discuss the seven
assault and battery convictions, for reasons stated later in this opinion.

considered only against its maker, where these statements, taken in light of admissions made by all of the defendants, could not have been prejudicial. [365-366]

Evidence at the trial of seven defendants charged with assault and battery was sufficient to permit the finding that all of the defendants were participants in a joint venture to commit a battery. [366-367]

At the trial of seven defendants charged with manslaughter and assault and battery, no abuse of discretion appeared from the judge's refusal to grant the defendants' motions for a continuance and for a change of venue. [367-368]

At a criminal trial the judge, who had asked prospective jurors the questions required by G. L. c. 234, § 28, and several additional questions, did not abuse his discretion by declining to ask certain other questions proposed by the defense. [368]

The courtroom seating of seven defendants during their joint trial created no unfairness. [368]

At a criminal trial, defense counsel's statement that "most young folks smoked marijuana" established no basis for his inquiring of a prosecution witness whether she had been smoking marihuana on the evening in question. [368-369]

A judge's order sequestering the witnesses at a criminal trial was not shown to have been violated and, had violation occurred, the remedy rested within the judge's discretion. [369-370]

At a criminal trial there was no error in a judge's refusing to furnish the jury with a transcript of the testimony of one of the witnesses for use during their deliberations. [370]

INDICTMENTS found and returned in the Superior Court Department on July 9, 1981.

The cases were tried before *Simons, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Brownlow M. Speer* for Robert Walker.

*William K. Danaher* for Joseph F. Burke.

*Imelda C. LaMountain* for Bruce C. Kern.

*Joseph C. Vosit (Stefan Grotz* with him) for Mark E. Hinman.

*Frank E. Antonucci* for Stephen Piretti.

*Henry J. Boitel,* of New York (*George B. Crane* with him) for Todd Terpak.

*David P. Connor & Kermit S. Goodman* for Peter P. Bianco, were present but did not argue.

*Daniel A. Ford,* Assistant District Attorney, for the Commonwealth.

O'CONNOR, J.  Each of the seven defendants was convicted by a jury on two indictments of involuntary manslaughter and one indictment of assault and battery.  Concurrent sentences of two and one-half years in a house of correction were imposed on each defendant on the manslaughter indictments and the assault and battery indictments were placed on file.  The defendants appealed the manslaughter convictions and we transferred the case to this court on our own motion.  Execution of the sentences on the manslaughter convictions was stayed pending appeal.  The defendants argue several grounds for reversal, including insufficiency of the evidence to support the convictions.  We hold that there was insufficient evidence on the crucial element of causation to support the manslaughter convictions, and we reverse them.

I.  *Facts.*

This case involves the deaths by drowning of Richard Retzel, eighteen years old, and Barry Griffin, nineteen years old, at approximately 1:10 A.M., on June 5, 1981, in Laurel Lake, in Lee.  There was evidence that earlier that night the two victims and another friend from Lee, Patrick Mangin, drove about the southern Berkshire area in a white Cadillac automobile.  When they arrived at an area known as the "white bridge," they met the defendant Burke and another youth, David Carpenter, who together had stopped alongside the road to urinate in the bushes.  The three got out of the white Cadillac, and, because Retzel did not like Burke, he and Mangin pushed Burke into the bushes. Griffin struck Carpenter in the face, breaking his jaw.  The three from Lee returned to the Cadillac and continued driving around the area.

Carpenter and Burke returned to Lenox, where they met the defendant Bianco, and one Michael Hadley, and told them that they had been beaten up by three men in a white

car. The four drove around looking for the white Cadillac, until, having no success, Carpenter and Burke left the other two. Bianco and Hadley, however, continued looking for the three men from Lee, and eventually found them parked at the boat ramp at Laurel Lake. Although Bianco and Hadley were prepared for a fight, they decided against it when the three denied having beaten Burke and Carpenter. Hadley even attempted to jump-start the white Cadillac because the battery was dead. Once again, Retzel, Mangin, and Griffin returned to driving around the area. Bianco and Hadley then proceeded to a party at the lakeshore cottage of Jack Hathaway. At the party the defendant Burke again described the earlier fight at the white bridge, and the defendant Bianco said to Burke and the other five defendants, "[B]eating up David Carpenter is like beating up [my] little sister, and they are not going to get away with that . . . . We will go kick ass." The seven defendants left the party in two cars, drove until they found the white Cadillac, and then followed it to Laurel Lake.

Mangin drove the white Cadillac onto the boat ramp, which declined toward the lake. The Cadillac faced the water and was stopped approximately ten feet from its edge. Mangin left the motor running with the gear shift in the "park" position. The defendants parked their cars behind the Cadillac. As they walked toward the Cadillac, they began yelling and then knocking on the windows of the car. Retzel and Griffin were pulled from inside the car, and a fist fight ensued in which, at a minimum, Bianco punched Retzel. Some of the defendants engaged in grabbing, punching, and kicking Mangin, Retzel, and Griffin.

In addition, there was evidence that the defendant Terpak jumped on the hood of the Cadillac, kicked in the windshield, and then jumped down to the driver's side, reached in and made a sweeping downward movement with his hand. At this moment, the Cadillac began rolling toward the water. Retzel and Griffin jumped into the car, and, for a brief moment, the car stopped rolling. Then suddenly, the front wheels lifted off the ground and the car plunged

into the water. As it sank, the defendants ran back to their cars and drove off.

Seeing the car in the water, Mangin dove in and attempted to open the doors of the submerged car. Thereafter, the police arrived.[2] When the car was hoisted from the lake, Retzel and Griffin were found dead. The cause was drowning. The defendants returned to the party at the Hathaway cottage where they were told by another youth of the deaths. They initially agreed not to cooperate with the police. But, later, five of the seven defendants made statements to the police admitting their involvement in the incident.

II. *Manslaughter.*

These indictments were tried on the theory that the defendants jointly committed one or more batteries that caused the deaths of Retzel and Griffin. A battery that causes death is manslaughter. *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967). *Commonwealth* v. *Sostilio*, 325 Mass. 143, 145 (1949). The prosecutor argued to the jury that there was a joint enterprise among the defendants to beat the young men from Lee in revenge for their attack on Burke and Carpenter, and that this beating caused Retzel and Griffin to attempt an escape from further attack by jumping into the Cadillac as it rolled toward the water. The prosecutor argued that the escape attempt failed because Terpak had put the gear shift lever into low, and as a result, Retzel's instinctive reaction to move the lever two places from drive to reverse in fact put the lever from low into drive, thereby plunging the Cadillac into the lake.

There is considerable authority for the principle that if, by a wrongful act, a man "creates in another man's mind an immediate sense of danger which causes such person to try to escape, and in so doing he injures himself, the person who

_____

[2] A State trooper, while on routine patrol on Route 20, was advised of the submerged vehicle with occupants. He radioed for assistance and dove into the water. Thereafter, other officers arrived.

creates such a state of mind" is criminally responsible for those injuries. *Regina* v. *Halliday*, 61 L.T.R. (n.s.) 701, 702 (1889). See generally *United States* v. *Guillette*, 547 F.2d 743, 749 (2d Cir. 1976), cert. denied, 434 U.S. 839 (1977); *Commonwealth* v. *Dorazio*, 365 Pa. 291, 296-298 (1950); *Letner* v. *State*, 156 Tenn. 68 (1927); R. Perkins, Criminal Law 710-711 (2d ed. 1969); W. LaFave & A.W. Scott, Jr., Criminal Law § 35, at 258 (1972); Focht, Proximate Cause in the Law of Homicide — With Special Reference to California Cases, 12 S. Cal. L. Rev. 19, 33 (1938). Assuming this to be a valid principle, we must address the preliminary question whether a rational trier of fact could have found in this case that a battery caused Retzel and Griffin to attempt flight.

The evidence warranted the defendants' convictions of assault and battery on Retzel. We conclude, however, that the evidence was insufficient to establish beyond a reasonable doubt that the assault and battery on Retzel caused Retzel and Griffin to enter the Cadillac. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). There was a critical void, therefore, in the Commonwealth's proof of manslaughter.

The evidence was that Retzel and Griffin ran to the Cadillac only when it began rolling toward the water after Terpak smashed the windshield and made the downward motion of his hand inside the car. Whether Retzel was attempting to put the gear shift lever into park or reverse is purely conjectural. Even if he was attempting to put it into reverse, it is equally conjectural whether he and Griffin were seeking to avoid combat, thereby leaving Mangin to whatever might befall him, or were merely seeking to preserve the car from further damage. While it is entirely possible on the evidence that Retzel and Griffin jumped into the Cadillac to effectuate an escape from bodily injury, as the Commonwealth contends, the alternative possibility may be argued with equal force. Since a causal relationship between the battery on Retzel and the deaths of Retzel and Griffin is required for manslaughter, *Commonwealth* v.

*Campbell, supra; Commonwealth* v. *Sostilio, supra,* and the evidence did not warrant that finding beyond a reasonable doubt, the defendants' convictions of manslaughter were unwarranted.

The Commonwealth did not argue to the jury that, even if Retzel and Griffin entered the car to prevent it from entering the water, the defendants' conduct caused that event and the resulting deaths. Terpak's conduct with respect to the car was not presented at trial as the conduct underlying the defendants' guilt of manslaughter, nor did the Commonwealth argue that Terpak should be convicted even if the other defendants were not. Because the attack on the Cadillac was not the basis of the Commonwealth's theory at trial,[3] we need not now consider whether a criminal act against property may be the basis for a manslaughter conviction. The defendants other than Terpak could not have been convicted on such a theory, in any event, because there was insufficient evidence that they shared the mental state required of joint venturers with respect to the attack on the car. See *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980); *Commonwealth* v. *Soares,* 377 Mass. 461, 470-472, cert. denied, 444 U.S. 881 (1979).

III. *Assault and Battery.*

As noted previously, the indictments for assault and battery were placed on file. "Absent exceptional circumstances, we do not consider appeals on assignment of error on indictments placed on file since no appeal may come before us until after judgment, which in criminal cases is the sentence. *Commonwealth* v. *Locke,* 338 Mass. 682, 684 (1959). *Commonwealth* v. *Subilosky,* 352 Mass. 153, 165 (1967)." *Commonwealth* v. *Delgado,* 367 Mass. 432, 438 (1975). Nonetheless, without suggesting what disposition

---

[3] In his argument to the jury, the prosecutor's focus on Terpak's conduct appears only to have been offered as support for his contention that Retzel intended to put the gear shift lever into reverse in order to effectuate an escape from the battery. The prosecutor did not argue that the attack on the car was a cause of Retzel's and Griffin's being in it.

would be appropriate in these cases, we recognize that the trial judge may choose to sentence the defendants on these indictments, in which case the defendants could appeal and raise several of the issues now presented to us. No additional issues would be presented at such time because, although the defendants have not appealed their convictions on the assault and battery indictments, they have fully argued their claim that the finding of assault and battery as an element of manslaughter should not stand. Therefore, there is no unfairness to the defendants in addressing these issues now, and in the interest of judicial economy, we choose to do so.

On the day of the incident, police officers took statements from the defendants Burke, Hinman, Walker, Kern, and Bianco. The defendants Terpak and Piretti made statements to civilian witnesses. Although the judge edited the statements made to police before allowing them to be read before the jury, he refused to order that plural pronouns such as "we" and "them" be changed to singular pronouns, and the defendants seasonably objected. The judge instructed the jury that each statement was admitted only against its maker. Our discussion is limited to the allegedly prejudicial impact of those statements which have bearing on the assault and battery convictions. The asserted error is that the editing of the statements of Burke, Hinman, Walker, and Kern was inadequate because plural pronouns were not deleted, with the result that in practical effect the defendants were confronted with statements which implicated them and were made by codefendants who were not subject to cross-examination, contrary to the teaching of *Bruton* v. *United States*, 391 U.S. 123 (1968).[4] Each of the statements, in the context of the rest of the evidence, placed the declarant at Laurel Lake at the critical time for the purpose, stated in various ways, of "getting back" at the attackers of Burke and Carpenter. In several of the state-

---

[4] The defendants' brief does not argue that the editing of Bianco's statement was inadequate.

ments, the declarant admitted to drinking alcoholic beverages before the incident and to making an agreement after the incident to keep quiet about it.

The defendants' contentions are answered by the reasoning of *Parker* v. *Randolph,* 442 U.S. 62 (1979), anticipated by this court in *Commonwealth* v. *Horton,* 376 Mass. 380, 389 (1978), cert. denied sub nom. *Wideman* v. *Massachusetts,* 440 U.S. 923 (1979), wherein we held that a defendant's Sixth Amendment rights are not violated by the admission in evidence of an incriminating confession of a codefendant, even if the codefendant does not take the stand, if the defendant himself has made admissible statements which are as damaging as those made by the nontestifying codefendant. *Commonwealth* v. *Scott,* 355 Mass. 471, 477-478 (1969). Here, since each defendant made a statement to either the police or civilian witnesses from which the jury could reasonably infer that he was at the scene of the fight with the intent to use physical force against the three passengers in the Cadillac to avenge an earlier assault against Burke and Carpenter, "no practical risk was created that the jury would improperly use against one defendant statements of another defendant." *Id.* Although some of the defendants did not admit to drinking or to an agreement to remain silent about the evening's events, that evidence was inconsequential in the light of the admissions made by all.

We next turn to consideration whether the evidence was sufficient to prove that the defendants were participants in a joint venture to commit a battery. The test is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary. *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980). *Commonwealth* v. *Soares,* 377 Mass. 461, 470-472 (1979). On appeal, it is our responsibility to "determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light

most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Campbell,* 378 Mass. 680, 686 (1979). *Commonwealth* v. *Latimore,* 378 Mass. 671 (1979). From the defendants' out-of-court statements, applying each statement solely to the declarant, and "from all the facts and circumstances" in evidence, *Commonwealth* v. *Casale, supra,* the jury were entitled to infer the presence of each defendant at the scene of the crime, his knowledge of what was taking place, and his willingness to participate. The Commonwealth was not required to prove the precise conduct of each defendant if there was evidence that a battery took place. Mangin testified that he saw Retzel being hit, and a pathologist testified that during the autopsy he observed cuts and bruises on Retzel's face.

The defendants make several other arguments, which we address briefly. They challenge the denial of their motions for a continuance and a change of venue based on pretrial publicity and community attitudes. In addition, they complain that the judge refused to put several requested questions to the jurors on voir dire, and that the judge's decision to seat the seven defendants together in the front row of the spectator section of the courtroom had the effect of grouping the defendants in the minds of the jurors, thereby reinforcing the Commonwealth's theory of joint enterprise. The defendants maintain that the total effect of these decisions was an unfair trial in violation of the Fourteenth Amendment to the United States Constitution. We disagree.

The decision whether to grant a motion for a continuance or a motion for a change of venue on the basis of pretrial publicity lies within the discretion of the trial judge. *Commonwealth* v. *Blackburn,* 354 Mass. 200, 203-205 (1968). When asked by the judge to demonstrate how the pretrial publicity put the defendants in a "highly unfavorable light," defense counsel failed to do so. "There was nothing so shocking and repellant in the crime[s] or the circumstances as to suggest that community opinion might be set against

the persons accused" so as to require a continuance. *Id.* at 204. Furthermore, the judge conducted an individual voir dire of each prospective juror, made a thorough and careful inquiry about pretrial publicity, and satisfied himself that each juror could render a fair and impartial verdict. There was no abuse of discretion in the denial of a continuance or change of venue. See *Commonwealth* v. *Turner,* 371 Mass. 803, 807 (1977).

The judge not only asked prospective jurors the questions required by G. L. c. 234, § 28, but he asked each juror numerous additional questions appropriate to a determination of impartiality. "The judge has broad discretion as to the questions to be asked, and need not put the specific questions proposed by the defendant[s]." *Commonwealth* v. *Prendergast,* 385 Mass. 625, 628 (1982), quoting from *Commonwealth* v. *Sanders,* 383 Mass. 637, 641 (1981). The trial judge is also entitled "to accept, without more, the declaration of the jurors as to their disinterest and freedom from emotional or intellectual commitment." *Commonwealth* v. *Gilday,* 367 Mass. 474, 492 (1975). *Commonwealth* v. *Subilosky,* 352 Mass. 153, 159 (1967).

Also without merit is the defendants' contention that the seating arrangement of the defendants in the courtroom was unfair. The judge's solution to the problem of seating the numerous defendants and counsel was a judicious accommodation of the defendants' need for access to counsel and familial support and the jury's need to identify who was on trial. Taken separately or in combination, there was no unfairness created by the denial of the requests for a continuance or for a change of venue, nor was there unfairness with respect to voir dire questioning of jurors or seating arrangements.

At a bench conference during the cross-examination of Reema Atalla, a prosecution witness who testified to conversations at the Hathaway cottage bearing on the intent with which the defendants went to Laurel Lake, defense counsel asked the judge if they would be permitted to ask the witness whether she smoked marihuana on the evening

in question. The judge responded that such questions would not be permitted unless there was "a substantial basis" for those inquiries. Counsel acknowledged that they had no independent evidence of marihuana use, but asserted that "most young folks smoked marijuana." The defendants argue that they were entitled to elicit evidence that had bearing on the ability of witnesses to perceive and recall events about which they testified. While we do not disagree with that contention, we have previously said, and we reiterate, that "[t]he attempt to communicate impressions by innuendo through questions which are answered in the negative . . . when the questioner has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts." *Commonwealth* v. *White,* 367 Mass. 280, 284 (1975), quoting from ABA Standards Relating to the Prosecution Function § 5.7(d) (Approved Draft 1971). The scope of cross-examination is largely a matter of discretion for the judge. *Commonwealth* v. *Underwood,* 358 Mass. 506, 513 (1970). The judge's refusal to permit the question was not an abuse of discretion.

The judge allowed defense motions to sequester witnesses. However, no sequestration order was articulated, and the Commonwealth and the defendants disagree as to the proper interpretation of the allowance of these motions. We interpret the ruling to require each witness to remain out of the courtroom until he or she has testified, and to prohibit the disclosure of what the evidence has been to a witness yet to testify. "The process of sequestration consists merely in preventing one prospective witness from being taught by hearing another's testimony . . . ." Reporters' Notes, Mass. R. Crim. P. 21, Mass. Ann. Laws, Rules of Criminal Procedure at 410 (1979), quoting from 6 J. Wigmore, Evidence § 1838, at 461 (Chadbourn rev. 1976). The defendants allege that the sequestration orders were violated and that the judge's failure to strike the testimony of the allegedly affected witnesses was an abuse of discretion. Although there was evidence that several witnesses spoke to each other during the trial, there was no evidence that any witness who

had already testified discussed his or her testimony with a prospective witness. The sequestration orders were not shown to have been violated. Even if they had been, the remedy for violation of a sequestration order rests within the sound discretion of the judge. *Commonwealth* v. *Jackson*, 382 Mass. 572, 582 (1981). *Commonwealth* v. *Hall*, 4 Allen 305, 306 (1862). We note that the witnesses who are alleged to have violated the sequestration order testified on different subject matters.

Finally, we address the defendants' argument that the judge erred in refusing to grant the jury's request, during deliberations, for a transcript of the testimony of one of the witnesses. The furnishing of a transcript to a deliberating jury is discretionary. Such discretion is to be cautiously exercised. *Commonwealth* v. *Mandeville*, 386 Mass. 393, 405 (1982). "The reading of testimony may . . . overemphasize certain aspects of the case." *Id.* The refusal to furnish a transcript to the jury was not error.

On the indictments for manslaughter, the judgments are reversed, the verdicts set aside, and judgments are to enter for the defendants. With respect to the indictments for assault and battery, the judge in the Superior Court is permitted, but not required, to sentence the defendants on these indictments. *Commonwealth* v. *Dowdican's Bail*, 115 Mass. 133, 134 (1874). *Marks* v. *Wentworth*, 199 Mass. 44, 45 (1908). Each defendant is entitled to have his case finally disposed of and judgment entered, and may demand that he be sentenced or discharged. *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975). *Marks* v. *Wentworth, supra.*

*So ordered.*

LIACOS, J. (dissenting). Manslaughter, like murder, is not statutorily defined in Massachusetts. The elements of the crime are derived from common law. See *Commonwealth* v. *Godin*, 374 Mass. 120, 126 (1977). Involuntary manslaughter has been defined as "an unlawful homicide,

unintentionally caused (1) in the commission of an unlawful act, malum in se,[1] not amounting to a felony nor likely to endanger life . . . , or (2) by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct" (citation omitted). *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967). See *Commonwealth* v. *Lacasse*, 365 Mass. 271, 273 (1974). These alternative bases of culpability were set forth in the judge's charge to the jury without objection. The primary question before this court is whether the evidence reasonably supports the jury's conclusion that the essential elements of involuntary manslaughter as to each defendant had been proved by the Commonwealth beyond a reasonable doubt: (1) that the defendants had engaged in a joint enterprise, (2) that the object of the joint enterprise was an unlawful act, and (3) that the misdemeanor was the proximate cause of the deaths.[2] The court concludes that there is insufficient evidence of proximate causation between the drownings of the victims and the attack by the defendants. Apparently, the court reaches this decision as a consequence of its conclusion that the conduct of the defendant Terpak in inflicting damage on the vehicle of the victims was not part of the defendants' joint venture to do physical violence. Terpak's actions are viewed by this court to be an interven-

---

[1] See *Commonwealth* v. *Adams*, 114 Mass. 323, 324 (1873) (an act malum in se includes injuries to persons or property when done wilfully or corruptly).

[2] Culpability for involuntary manslaughter may also be based on an omission or failure to act when there is a legal duty to act. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 397 (1944); 2 C. Torcia, Wharton's Criminal Law § 172 (14th ed. 1979). Some courts have held that there is a duty to rescue a person who has been endangered by the defendant's criminal activity. See *Jones* v. *State*, 220 Ind. 384, 387 (1942); *State* v. *Myers*, 7 N.J. 465, 475-481 (1951); W. LaFave & A.W. Scott, Jr., Criminal Law § 26, at 186 (1972). Cf. *Commonwealth* v. *Cali*, 247 Mass. 20, 24 (1923) (defendant had duty to extinguish fire in building even if accidentally caused). This theory of culpability was not raised at trial. Consequently, I do not premise my dissent on the possible culpability on the part of the defendants for failing to rescue the victims from the submerged automobile.

ing cause breaking the chain of causation.  I believe that the evidence was sufficient for the jury to infer beyond a reasonable doubt that the attack on the automobile was part of the unlawful joint enterprise.  The permissible inferences to be drawn from the evidence are sufficient "to bring minds of ordinary intelligence and sagacity to the persuasion of guilt beyond a reasonable doubt."  *Commonwealth* v. *Casale,* 381 Mass. 167, 168 (1980).  Accordingly, I dissent.

1. *Joint venture.*  The court sets forth the proper test for determining a joint venture.  The ultimate conclusion it reaches, however, is unwarranted.[3]  To require proof of intent or agreement to commit a particularized "battery" on these facts is inconsistent with common sense.  Our manslaughter cases focus on the conduct involved, not the harm intended.  Conduct which reasonably and foreseeably causes harm and, ultimately, death is sufficient to establish manslaughter if that conduct is wanton and reckless.  *Commonwealth* v. *Godin, supra.*  The court's view that the evidence was only sufficient for the jury to find that the defendants were participants in a joint venture to do physical violence on the occupants of the automobile is unjustifiable.  There was ample evidence of a planned assault on three persons by the seven defendants.  There was evidence that the defendants knew their intended victims to be operating a motor vehicle.  It was clearly foreseeable that this plan could produce not only assaults and batteries on the persons but also attacks on the vehicle, if necessary.

The evidence presented to the jury showed the objectives of the defendants to be to "kick ass," "go look for the guys in

---

[3] The court states:  "The defendants other than Terpak could not have been convicted on [a theory of joint venture], in any event, because there was insufficient evidence that they shared the mental state required of joint venturers with respect to the attack on the car."  *Supra* at 364.  The judge charged the jury that a joint venture could be considered in the context of an intent to participate in either a "criminal venture" or the assault and battery, and "[s]ome active participation in or furtherance of the criminal enterprise."  There was ample evidence to warrant a verdict of guilty on either theory.

the Cadillac," "get them back," "find these guys," "teach them a lesson," or "beat the shit out of them." There is also evidence that everyone was reaching and grabbing into the automobile. Furthermore, no defendant objected to or protested the breaking of the windshield. Several of them pounded on the windows of the automobile. After appraising the evidence, the jury could have drawn the reasonable inference that the agreement among the defendants was to commit unlawful acts of a violent nature against the persons and against their possessions, including an attack on the vehicle.[4] I doubt that a jury should be required to engage in consideration of the unlikely speculation that criminal defendants of this kind divided their unlawful plans to preclude a damage to the vehicle. Indeed, an assault on the automobile could be viewed as an assault on the occupants. Assaultive conduct need not be inflicted directly on the victim. See *People* v. *Moore*, 3 N.Y.S. 159, 160 (Sup. Ct. 1888); W. LaFave & A.W. Scott, Jr., Criminal Law § 81, at 604 (1972); R. Perkins, Criminal Law 108-109 (2d ed. 1969). Therefore, the defendants can be held culpable for the unintended results of the attack on the victims and their automobile if those results were proximately caused by the unlawful conduct of the defendants.

2. *Proximate causation.* It is true that proximate causation in a criminal case must entail a closer relationship between the result and the intended conduct than proximate causation in tort law. See *Commonwealth* v. *Rhoades*, 379 Mass. 810, 823-825 (1980); W. LaFave & A.W. Scott, Jr., *supra* at 251. The court, however, has carried this principle too far and concludes that there is insufficient evidence to establish proximate causation beyond a reasonable doubt because of the court's uncertainty whether the victims jumped into the automobile to escape or to protect the vehi-

---

[4] The jury properly followed the charge given by the trial judge on joint venture and assault and battery. The court's opinion is silent on whether there was an objection to these aspects of the charge. The record reveals that there was none on these issues.

cle from harm.[5] The intent or purpose of the deceased victims is a matter of fact which is not susceptible of proof by direct evidence. The victims are not alive to tell us why they got back into the automobile. Therefore, a jury must rely on proper inferences from all the facts and circumstances developed at the trial. See *Commonwealth* v. *Casale, supra* at 172, and cases cited. "The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable." *Id.* at 173.

The entire incident was estimated to have taken place in twenty to thirty seconds. The melee involved seven men against three. The statement of one defendant indicated shouts of "We're going to kill you." A witness testified that the victims were wobbly as they got back in their automobile. Several witnesses testified that the automobile accelerated very rapidly and the two front wheels came off the ground, enabling the automobile to clear the four and one-half inch curb.[6] In fact, one of the defendants indicated in his statement that he thought the deceased were trying to get away from harm. From these facts the jury could reasonably infer that the victims sought to escape further harm. The evidence was sufficient to permit the jury to infer the existence of an essential element. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

Injury during an escape is within the scope of foreseeability by persons intending physical violence. See *Jones* v.

---

[5] The defendants might also have been held criminally responsible for death resulting from attempts to rescue property put in jeopardy by the wrongful act of a defendant. See *State* v. *Leopold*, 110 Conn. 55, 62 (1929). The Commonwealth, however, did not proceed on this basis. I do not rely, therefore, on this principle.

[6] Acceleration of a motor vehicle so rapidly that the two front wheels lift off the ground is not compatible with the court's view that the evidence can be interpreted equally such that the victims were merely trying to prevent damage to the automobile. The thought that these victims would be concerned about the vehicle rather than their own physical safety is pure sophistry. Common sense would tell a jury otherwise, as this jury found. Indeed, the only question here is whether the jury's verdict is sufficiently supported by the evidence. Clearly, this jury's verdict is amply supported.

375 Mass. 358 375

*State,* 220 Ind. 384, 387 (1942). Whether Retzel was attempting to put the gear shift in park or reverse is irrelevant. The evidence showed that, in his escape attempt, he missed both, and the vehicle was in drive as a result of defendant Terpak's attack on the automobile.

This is not a situation where the defendants' joint actions of physical violence remotely linked a chain of events leading to the victims' deaths. The normal, impulsive tendencies of the victims to escape were caused by the attack of the defendants. See *Commonwealth* v. *Rhoades, supra* at 825. Death during the attempt by the victims to avoid further harm was the foreseeable result of the continuous sequence of events caused by the defendants' joint actions. *Id.* The evidence and the inferences permitted to be drawn reasonably support a finding of proximate causation beyond a reasonable doubt. See *Commonwealth* v. *Casale, supra* at 172, 173; *Commonwealth* v. *Latimore, supra* at 677. This court should not invade the province of the jury by substituting its judgment on questions of fact. I dissent.