Ford, J.
The defendant, who is charged with two counts of murder along with several other related crimes, moves for the transfer of his case for trial outside Berkshire County. A hearing on the defendant’s Motion was held before me on August 12,1993. At the hearing, Iwas provided with copies of articles about the case which appeared in area newspapers and on local radio stations, as well as with video tapes of news stories about the case which appeared on two area television stations. In addition, I have had the benefit of memoranda of law and oral arguments from both counsel.
Mass.R.Crim.P. 37(b)(1) provides:
A judge upon his own Motion or the Motion óf the defendant or the Commonwealth made prior to trial, may order the transfer of a case to another division or county for trial if the court is satisfied that there exists in the community where the prosecution is pending so great a prejudice against the defendant that he may not there obtain a fair and impartial trial.
It is well settled that the matter of transfer is within the discretion of the trial judge. Commonwealth v. Gilday, 367 Mass. 474, 491 (1975). The burden is upon the moving party to show prejudice necessitating the relief sought. Commonwealth v. Turner, 371 Mass. 803, 807 (1977). “A change in the place of trial . . . should be ordered with ‘great caution and only after a solid foundation of fact has first been established.’ ” Commonwealth v. Angiulo, 415 Mass. 502, 515 (1993), quoting Crocker v. Superior Court, 208 Mass. 162, 180 (1911). Moreover, the existence of pretrial publicity does not alone indicate that an impartial jury cannot be impaneled. Commonwealth v. Jackson, 388 Mass. 98, 108 (1983), citing Dobbert v. Florida, 432 U.S. 282, 302-03 (1977). Indeed, “it is not necessary . . . that all citizens who have read of or been interested in a crime be excluded from the jury or that the trial take place where few such citizens will be found. Intelligent persons read and take an interest in events; because of the same endowments they are likely to give regard to the evidence and to disregard rumor, report, and suspicion when in the solemnity of á courtroom a defendant is tried and his reputation, his liberty or his life are at stake.” Commonwealth v. Blackburn, 354 Mass. 200, 204 (1968). The touchstone in all of this is the defendant’s right to a fair trial and an unbiased jury.
The defendant argues that the case should be transferred to either Suffolk or Middlesex County. He asserts that he will be unable to obtain a fair trial in any of the four western counties (Berkshire, Franklin, Hampden and Hampshire) or in Worcester County. He claims that citizens of those five counties are homogeneous, that they share common interests and common concerns, and that they would consider Great Barring-ton (the town in which the defendant is alleged to have committed his crimes) to be in their “back yard.” He argues that Springfield newspapers and television stations reach throughout the five counties, and that the media coverage through those outlets has been so pervasive and unfair to him that it will be impossible for him to receive a fair trial anywhere other than in eastern Massachusetts. On the other hand, the Commonwealth argues that the case should remain in Berkshire County. The District Attorney points to a number of highly publicized cases which have been tried in Berkshire County in recent years and in which a change of venue was found to be unnecessary. He asserts that the defendant has not met his burden of showing prejudice necessitating a transfer of the place of trial. In addition, he asks this court to consider the expense and inconvenience to his staff and to his witnesses which will result if the case is transferred.
I most respectfully disagree with both the defendant and the Commonwealth. I do not see Berkshire, Franklin, Hampshire, Hampden and Worcester counties as being at all homogeneous. Having had the experience of presiding over cases in each of those five counties, I believe that there are tremendous differences among them in both interests and local culture. I absolutely do not believe that the people of Franklin, Hampshire or Hampden counties think of Great Bar-rington as being in their “back yard.” My experience has been that the overwhelming majority of people in those three counties pay little or no attention to the goings-on in Berkshire county. They are far more concerned about their own local affairs. I recognize that publicity about this case in Springfield newspapers and on Springfield television and radio stations has been extensive, and that those media outlets cover Hampshire and Franklin, as well as Hampden County. However, “pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." Commonwealth v. Burden, 15 Mass.App.Ct. 666, 672 (1983), quoting Nebraska Press Association v. Stuart, 427 U.S. 539, 565 (1976). “Moreover, it is not required . . . that the jurors be totally ignorant of the facts and issues involved ... It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.” *185 Commonwealth v. Burden, supra, quoting Irvin v. Dowd, 366 U.S. 717, 722-23 (1961). Therefore, the mere fact that there has been heavy coverage of this case in the Springfield media does not eliminate Hampden, Hampshire or Franklin counties as potential locations for this trial. The question is whether the defendant could receive a fair trial in those counties.
Naturally, the heaviest publicity about this case has occurred in Berkshire County. Local newspapers have run a substantial number of stories about this case. Local radio stations and those area television stations which are received in Berkshire County have also saturated the area with coverage about the case. Almost without exception, the coverage has been negative to the defendant. He has been portrayed as a racist, an anti-Semite, a homophobe, a skinhead, a fascist, and a neo-Nazi. He was described by fellow students as being “really strange, really weird, and extremely bigoted.” Some students reported being “afraid of him for a long time,” and said that he “seemed to have a lot of hatred in him for a lot of people.” In addition, much of the local press coverage speculated about possible motives for the shootings, and reported that the defendant was alleged to have made various threats against different persons and groups prior to the shootings. If the defendant’s state of mind becomes an issue during the trial, as it almost certainly will, those types of references could turn out to be highly prejudicial.
Moreover, Simons Rock College, where the murders were allegedly committed, is itself a well known institution in southern Berkshire County; its facilities are shared by many people throughout the area. According to press coverage, both the college community and the community at large were “traumatized” and “shattered” by the incident. Mental health professionals expressed through the local media their serious concerns about the effect of the murders on students at the college and children in the community at large. United States Senator Edward M. Kennedy delivered a speech at the college, in which he called for gun control and compared the grief felt by the survivors at Simons Rock to his own sorrow resulting from the assassinations of his two brothers; that speech was widely reported in the local media. One local newspaper article contained the following information:
As the initial shock of the shootings at Simons Rock of Bard College began wearing off, calls from people and groups here and in surrounding towns began trickling in with offers of aid, sympathy and support. The trickle soon became a flood, and literally hundreds of offers of help and condolences have been received. “Town officials such as the Great Barrington Board of Selectmen and the Planning Board, numerous community people and businesses have offered everything from food to rooms to rides to the airport,” a spokesperson from the college said ... ¡The] president of the Southern Berkshire Chamber of Commerce said he was glad to help out “in any way we could.” The reason he called the college and offered his support as well as that of the Chamber “is mostly emotional,” he said . . . “and I wanted to show them the community is behind them,” “It is partially community spirit, but also, you hear of a tragedy and say, ‘But for the grace of God, that could have been me,’ ” [a local motel owner] added. (Emphasis added.)
I am convinced that the emotional impact of this event has been far more extreme in Berkshire County than in the three other western counties. To many people in Berkshire County, this was a tragedy of unspeakable proportions. Many people in the three other western counties, I am sure, also view this case as a terrible tragedy, but it hit much closer to home for Berkshire residents than it did for residents of the three other counties. Many individuals in Berkshire County know people who were either directly or indirectly involved in the case (e.g., a student of the college, an employee of the college, someone who does business with the college, a police officer involved in the investigation, a medical professional who attended to the victims, or a mental health professional who counselled the survivors). For those individuals and their families, I believe that the impact of this case has been much more personal and profound than it has been to the people of the three other western counties. I note that newspaper accounts of the memorial services held in Great Barrington a few days after the shootings indicate that the outpouring of sympathy from the southern Berkshire community was tremendous and, I have no doubt, very sincere. The allegations touched not only southern Berkshire County, where the shootings occurred, but also Pittsfield, where the murder weapon was allegedly procured from a well known local gun shop (a subject which itself resulted in heavy press coverage). Much of the press coverage of the case indicates to me that the guilt of the defendant may have been “substantially prejudged by the residents of the county.” Commonwealth v. Smith, 353 Mass. 487, 490 (1968). The allegations against the defendant are “so shocking and repellent... as to suggest that community opinion might be set against the person accused.” Commonwealth v. Blackburn, 354 Mass. 200, 204 (1968). Because of the abhorrent and sensational nature of the crimes charged, the devastating effect on many Berkshire residents, the extensive local media coverage of the case, and the unfavorable way in which the defendant has been repeatedly portrayed, I seriously doubt that it will be possible to impanel an unbiased jury in Berkshire County.
I am well aware of the fact that highly publicized cases have been tried in Berkshire County in recent years, and that very fair and capable jurors have been called upon to decide those cases. The District Attorney cites two such cases in particular: Commonwealth v. Bianco, 388 Mass. 358 (1983), and Commonwealth v. JoAnn Wadsworth, Berkshire Superior Court Docket Nos. 850263-850266.[1] In Bianco, commonly known as the “Lenox Seven” case, seven young men from Lenox *186 were accused of manslaughter in connection with the drowning deaths of two young men from Lee. The case spawned much gossip and generated enormous local interest and press coverage. However, the circumstances surrounding the deaths in that case were far from clear, and the press was never able to report with any measure of certainty exactly what the defendants were alleged to have done. In addition, the tenor of the press coverage was mixed. Many articles suggested that the defendants were being unfairly prosecuted, and that the case amounted to nothing more than a tragic accident. In fact, defense lawyers were unable to demonstrate to the trial judge how the pretrial publicity put the defendants in a “highly unfavorable light.” Commonwealth v. Bianco, supra at 367. In Wadsworth, the Treasurer of Berkshire County was accused of larceny from the county retirement fund. Once again, the press coverage was intense. However, a significant amount of the coverage suggested that Wadsworth had been duped by the Treasurer of Norfolk County, with whom she was romantically involved, and that the investigation into her affairs was a political witch hunt. The point is that in both of those cases there were several news stories which were arguably favorable to the defendants. That is not true in the instant case, as the local coverage has been almost entirely negative. Moreover, the crimes charged in Bianco and Wadsworth were not nearly as “shocking and repellant” as those charged in the instant case. Commonwealth v. Blackburn, supra, at 204. Indeed, the District Attorney referred to the defendant’s actions in this case as rising to a level of “savagery and violence unparalleled in county history.” For all these reasons, the circumstances of neither of those two cases compare favorably to the case at bar.
In view of the expense and inconvenience to which the District Attorney has alluded, I have seriously considered the possibility of at least trying to impanel a jury in Berkshire County, and then transferring the case only if that effort were unsuccessful. However, my fear is that an unsuccessful attempt to impanel a jury in Berkshire County would set off another round of press coverage. That coverage could well include unflattering remarks about the defendant made by potential jurors during voir dire examination. If those types of negative comments, together with the fact of a failed attempt to impanel a jury in Berkshire County, were reported through Springfield media outlets, it might then become difficult or impossible to impanel a jury immediately thereafter in Franklin, Hampshire, or Hampden Counties. Such a round of press coverage, coming on the very eve of the transfer of the case to a neighboring county, would probably necessitate a continuance of the case, which I am sure both parties want to avoid.
In addition, transfer of the case to the neighboring county of Hampden will not, in my opinion, result in undue hardship or inordinate expense to either side. Springfield, after all, is only one hour away from Pittsfield by automobile, and is easily accessible by way of the Massachusetts Turnpike from both central and southern Berkshire County. In addition, it is only a short distance from Bradley International Airport, which should be convenient for any witnesses who will be required to fly into the area in order to attend the trial. There are a number of hotels and motels in the Springfield area, in the event that anyone feels the need to stay overnight. In addition, the Hall of Justice in Springfield is an excellent facility, and lends itself well to a trial of this magnitude.
In summary, I have grave concerns about the ability of this Court to provide the defendant with a fair trial in Berkshire County. However, I also believe that it is not necessary to move the trial to Suffolk County or Middlesex County, and that the defendant will be able to obtain a fair trial in Hampden County. I conclude that the emotions and feelings of the citizens of Hamp-den County are not nearly as strong as those of a substantial number of persons in Berkshire County. I further believe that, while news reporting of the case in Hampden County has been extensive, the Court will be able to find an ample number of jurors who have either not paid close attention to the coverage or who will be able to disregard the coverage and judge the case based only upon the evidence presented in court.
For the foregoing reasons, it is the ORDER of this court that the defendant’s Motion for Transfer of the Case for Trial shall be, and the same hereby is, ALLOWED. The case is hereby transferred to Hampden County for trial. Trial shall commence on October 4, 1993, in Courtroom 2 of the Hall of Justice in Springfield.

 I was personally involved in both of those cases. My remarks herein about the press coverage of those cases is based upon my own memory.